# The Credit Mobilier of America *versus* The Commonwealth of Pennsylvania. (*a*)

1. The proof arising from a settlement for taxes on dividends made by trustees under a deed of trust for stockholders of a corporation when made from the books of the trustees, is answered by showing that the corporation did not own the contract out of which the divided profits arose and which had been transferred to the trustees, but that the business had been arranged with the intention to use the corporation to conduct it, and this being prevented, it was given to trustees to conduct for the benefit of the same persons as would have been entitled as stockholders if the corporation had undertaken the business and become the contractor, and the trustees were required to divide the profits among the stockholders of the company.

2. The stockholders, instead of shielding themselves from personal liability

(*a*) This case belongs to the Middle District, but as one of peculiar interest is inserted here in advance of the cases of the same term.

[Credit Mobilier *v.* Commonwealth.]

by vesting the contract in the corporation, having personally undertaken to do the work, the Commonwealth has no claim for taxes on the profits.

3. A railway contract entered into by A., and by him assigned to trustees to execute and divide the profits among certain persons, renders A. and the trustees and the persons receiving the profits, with notice of the trust, personally liable as partners.

(*a*). It is not material that the *cestui que trusts* are described as the stockholders in a corporation.

(*b*). Nor that the corporation guaranties all persons from liability in the execution of the contract.

(*c*). Nor that the corporation agreed to advance funds and receive a commission.

(*d*). Nor that part of the work had been done by the corporation in the expectation that the contract would be transferred to it, and the contractor agreed with the railway company to pay the corporation for the work that had been done.

(*e*). These circumstances do not make the contract the property of the corporation, nor are the profits divided among the shareholders thereby made corporate property.

(*f*). Profits made by persons described as shareholders in a corporation in a business in which they are personally liable are not the subject of taxation as profits of the corporation, although the corporation agrees to advance funds to conduct that business, and agrees to guaranty the individuals from loss.

4. Where a deed does not in legal effect vest title in a corporation, if the Commonwealth seeks to prove that such title did vest in the corporation, the latter can prove that the intent of the parties was in accordance with the legal effect of the words used, and not what is asserted by the Commonwealth.

5. The Commonwealth claiming that property assigned to trustees in trust for the stockholders of a corporation belongs to the corporation for the purpose of taxation, the defendants may show:

(*a*). That there was a stipulation made at the time of the transfer that it should not become the property of the corporation, though it was not made part of the written transfer:

(*b*). That the parties uniting in the transfer reserved a power to prevent the property passing to the corporation if the transferees attempted to give the title to it, even though the transfer was in writing and the right reserved was not expressed:

(*c*). That the parties did not consent to the transfer till they obtained an opinion of counsel that this would not vest the title in the corporation.

6. Where all the evidence shows no title in a corporation sought to be taxed as owner, the court should so instruct the jury. Per READ; SHARSWOOD and WILLIAMS, JJ.

May 17th and 18th 1870. Before THOMPSON, C. J., READ, AGNEW, and SHARSWOOD, JJ.

Error to the Court of Common Pleas of *Dauphin county:* Of May Term 1870, No. 43.

This was an appeal by "The Credit Mobilier of America," from a settlement of tax against them by the accounting officers of the Commonwealth. The appeal, specifications, &c., were filed August 9th 1869, and the case was tried November 23d, 1869.

The settlement was for tax on capital stock, and was made July 14th 1869, as follows, viz.:—

[Credit Mobilier *v.* Commonwealth.]

" Allotments made to stockholders of the Credit Mobilier of America, on the capital stock of $3,750,000.

| | |
|---|---|
| 1867, Dec. 12, 60 per cent. bonds Union Pacific Railroad Co. at 85 per cent. . . . . | $1,912,500.00 |
| 1868, Jan. 3, 20 per cent. bonds Union Pacific Railroad Co., at 85 per cent. . . . . | 637,500.00 |
| 1868, July 3, 75 per cent. bonds Union Pacific Railroad Co., at 85 per cent. . . . . | 2,390,625.00 |
| 1867, Dec. 12, 60 per cent. bonds Union Pacific Railroad Co., at 35 per cent. . . . . . | 787,500.00 |
| 1868, June 17, 40 per cent. bonds Union Pacific Railroad Co., at 35 per cent. . . . . | 525,000.00 |
| 1868, June 17, 60 per cent. cash, | 2,250,000.00 |
| 1868, July 8, 30 per cent. cash, | 1,125,000.00 |
| | $9,628,125.00 |
| Tax at the rate of one-half mill on capital stock for each one per cent. of dividends, . . . | $481,406.25 |
| Add 10 per cent. penalty for failure to report, . . . . | 48,140.62　$529,546.87." |

The defendants were incorporated by the legislature of Pennsylvania on the 1st of November 1859, under the name of " The Pennsylvania Fiscal Agency;" by Act of March 26th 1864, the name of the corporation was changed to " The Credit Mobilier of America."

Under Acts of Congress of the 1st of July 1862, and July 2d 1864, the Union Pacific Railroad Company was incorporated, and large grants of land were made to the company to aid them in constructing a railroad and line of telegraph from the Missouri river to the Pacific.

In 1865 the company entered into a contract with one Hoxie for constructing 247 miles of the road east of the 100th meridian. This contract was assigned to the defendants, who completed it and paid the taxes due the Commonwealth on the dividends arising from the profits on it.

Another contract was made in 1867 with Oakes Ames for completing the road ; a distance of 667 miles. This contract was afterwards assigned to certain trustees, and arrangements, appearing by agreements hereafter stated, were made with the defendants in connection with it. Under the assignment and the other agreements, the Commonwealth claimed that the profits made from

[Credit Mobilier *v.* Commonwealth.]

this contract were for the benefit of the defendants as a corporation, the *cestuis que trust* under the assignment being stockholders of the corporation, &c. The defendants alleged that the profits belonged to the *cestuis que trust* as individuals, and that therefore no tax was payable to the Commonwealth by the corporation, defendants.

The Commonwealth called J. M. Forster, the "corporation clerk" in the auditor-general's office, who testified that there had been a settlement against the defendants, June 1st 1869, showing that there were due to the Commonwealth $2,820,000. A copy of this settlement was served on the president of the defendants. A re-settlement was afterwards (July 14th) made upon information received from the treasurer of the defendants and the treasurer of the trustees. They produced a contract between the defendants and certain trustees and claimed that the profits were not made for the company but under the contract; they did not admit that the corporation, as such, had made the profits.

The Commonwealth gave in evidence the settlement, as stated above, and rested.

For the defendants, B. F. Ham, their assistant treasurer, testified as to the value of the assets in 1867. He testified also that the defendants had made a dividend of 6 per cent. for each of the two preceding years, on which a tax amounting to $30,590 had been paid to the Commonwealth. Hoxie failed to execute his contract and it was assigned to the defendants. A contract was made October 15th 1867, between Oakes Ames of the first part, Thomas C. Durant and others, trustees, of the second part, and the defendants of the third part; the defendants received about $1,500,000 under this contract, which was used for paying dividends for 1867, and was returned and taxed; allotments were made to defendants between November 1867 and November 1868 to the amount of $1,000,000, with which stock in the Union Pacific Railroad Company was purchased; the dividend to the stockholders from this sum was paid by the trustees in Union Pacific stock, making not quite 30 per cent.; the defendants paid the tax for only 12 per cent. of the dividend for those years; it was stipulated that a certain portion of the profits of the contract should be taken in the stock of the road.

The defendants further gave in evidence the "Oakes Ames" contract, dated August 16th 1867, between the Union Pacific Railroad Company of the first part, and Oakes Ames of the second part, viz.:—

"1. The party of the second part agrees and binds himself, &c., to build and equip the following named portion of the railroad and telegraph line of the party of the first part, commencing at the one-hundredth meridian of longitude upon the following terms and conditions, to wit:—

[Credit Mobilier v. Commonwealth.]

"1st, 100 miles at and for the rate of $42,000 per mile, &c. * * * (the whole)—667 miles.

" 2. At least 350 miles shall be, if possible, completed and ready for acceptance before the 1st day of January 1868, provided the Union Pacific Railroad Company transport the material. The whole to be constructed in a good and workmanlike manner, upon the same general plan and specifications adopted east of the 100th meridian of longitude. The party of the second part shall erect all such necessary depots, machine-shops, machinery, &c., at a cost of not less than $7500 per mile, in cash; and shall construct all such necessary side-track, &c. * * *

" 3. Whenever one of the above-named sections of the road shall be finished to the satisfaction and acceptance of the government commissioners, the same shall be delivered into the possession of the party of the first part, and upon such portions of the road as well as on that part east of the 100th meridian now completed, &c.

" 5. The party of the second part, his heirs, &c., is to receive from the company and enjoy the benefit of all existing contracts, and shall assume all such contracts and all liabilities of the company accrued or arising therefrom for work done or to be done, and materials furnished or to be furnished for or on account of the road west of the 100th meridian, crediting, however, the party of the first part on this contract, all moneys paid or expended on account thereof.

" 6. The party of the second part for himself, &c., stipulates and agrees that the work shall be prosecuted and completed with energy and all possible speed, so as to complete the same at the earliest practicable day, it being understood that the speed of construction and time of completion is the essence of this contract, and at the same time the road to be a first-class road with equipments; and if the same, in the opinion of the chief engineer, is not so prosecuted, both as regards quality and despatch, that the said party of the first part shall and may, through its general agent or other officer detailed for that purpose, take charge of said work and carry the same on at the proper cost and expense of the party of the second part.

" 8. All the expenses of the engineering are to be charged to and paid by the party of the second part, except the pay and salary of the chief engineer and consulting engineer, and their immediate assistants, and the expenses of the general survey of the route.

" 10. Payments to be made as the work progresses upon the estimate of the chief engineer, in making which the engineer shall deduct from each section its proportion of the cost of equipments not then furnished, &c.

" 11. Payments hereon shall be made to the party of the second part, his heirs, &c., in cash; but if the government bonds received

[Credit Mobilier *v.* Commonwealth.]

by the company cannot be converted into money at their par value net, and the first mortgage bonds of the company at 90 cents on the dollar net, then the said party of the second part, &c., shall be charged hereon, the difference between the amount realized and the above-named rates; provided the first mortgage bonds are not sold below 80 cents on the dollar, and if there shall not be realized from the sale of such bonds, an amount sufficient to pay the party of the second part, his heirs, executors, administrators or assigns, for work as stipulated in this contract, and according to the terms thereof, then such deficiency shall be from time to time subscribed by the said party of the second part, &c., to the capital stock of said company, and the proceeds of such subscription shall be paid to said party of the second part, his heirs, executors, administrators or assigns, on this contract.

"13. The amount provided to be expended for equipments, station-buildings, &c., shall be expended under the direction of the party of the first part, and in such proportion for cars, locomotives, machine-shops, station-buildings, &c., and at such points as they may determine.   The party of the first part to have the full benefit of such expenditures, without profit to the contractor, or they may in their option purchase the equipments and expend any portion of said amount, provided at any point on the road, where they may deem the same most advantageous to the company, whether on the section on which the said reservation occurs or not.

"14. The telegraph line is included herein under the term railroad, and is to be constructed in the same manner and with similar materials as in the line east of the 100th meridian, &c.

" This contract having been submitted to the executive committee by resolution of the board of directors, August 16th 1867, and we having examined the details of the same, recommend its execution by the proper officers of the company, with the Honorable Oakes Ames, the party named as the second part."

Resolution passed by executive committee of Union Pacific Railroad, at a meeting held October.1st 1867.

"Resolved, The foregoing contract between the Union Pacific Railroad Company and Oakes Ames, referred to the executive committee by a resolution of the board, August 16th 1867, to settle the details, be approved, and that the proper officers of the company be instructed to execute the same, subject however to the written approval of the stockholders of the company as understood by the board of directors when the same was voted upon.

" OLIVER AMES,<br>
" THOS. C. DURANT, &c.<br>
" Executive Authority."

Also, assignment of the same contract, viz. :—

" Memorandum of agreement, In triplicate, made this fifteenth day of October 1867 between Oakes Ames, of, &c., of the first part,

Thomas C. Durant, Oliver Ames, John B. Alley, Sidney Dillon, Cornelius S. Bushnell, Henry S. McComb and Benjamin E. Bates, of the second part, and the Credit Mobilier of America, of third part, witnesseth: That whereas the party of the first part, has undertaken a certain large contract for the construction of certain portions therein named of the railroad and telegraph line of the Union Pacific Railroad Company, which will require a very large and hazardous outlay of capital, which capital he is desirous to be assured of raising at such times and in such sums as will enable him to complete and perform the said contract according to its terms and conditions.

" And whereas, The Credit Mobilier of America, a corporation duly established by law, is empowered by its charter to advance and loan money, in aid of such enterprises, and can control large amounts of capital for such purposes, and is willing to loan to said party of the first part such sums as may be found necessary to complete said contract, provided, sufficient assurance may be made to said party of the third part herein, that such sums shall be duly expended in the work of completing said railroad and telegraph line, and that the payments for the faithful performance of said contract, by said railroad company, shall be held and applied to reimburse said party of the third part for their loans and advances, together with a reasonable interest for the use of the money so loaned and advanced.

" And whereas, The said party of the third part fully believes that said contract, if honestly and faithfully executed, will be both profitable and advantageous to the parties performing the same, are therefore willing to guaranty the performance and execution of the same for a reasonable commission to be paid therefor.

" And whereas, Both parties of the first and third parts have confidence and reliance in the integrity, business capacity and ability of the several persons named as parties of the second part hereto, and confidently believe that said persons have large interests, as well in the Union Pacific Railroad Company as in the Credit Mobilier of America, they will execute and perform the said contract, and faithfully hold the proceeds thereof, to the just use and benefit of the parties entitled thereto.

" Therefore, It is agreed by and between the parties of the first, second and third parts hereto as follows: that is to say, that said Oakes Ames, party of the first part hereto, for and in consideration of the sum of one dollar, &c., paid by the party of the second part, and for divers other good and valuable considerations him thereunto moving, doth hereby assign, set over, and transfer unto the said Thomas C. Durant, Oliver Ames, John B. Alley, Sidney Dillon, Cornelius S. Bushnell, Henry S. McComb and Benjamin E. Bates, parties of the second part, all the right, &c., in and to the certain contract heretofore made and

executed by and between the Union Pacific Railroad Company and the said Oakes Ames, bearing date the 16th day of August 1867, &c., the said parties of the second part, to have and to hold the same to them and their survivors and successors, for ever, in trust, nevertheless, upon the following trust and conditions and limitations, to wit :—

" I. That they, the said parties of the second part, shall perform all the terms and conditions of the contract so assigned, in all respects, which in and by the terms and conditions thereof, is undertaken, &c., by the said party of the first part herein named.

" II. That they, the said parties of the second part, shall hold all the avails and proceeds of the said contract, and therefrom shall reimburse themselves and the party of the third part hereto, all moneys advanced and expended by them, or either of them, in executing or performing the said contract, with interest and commission thereon as hereinafter provided.

" III. Out of the said avails and proceeds to pay unto the parties of the second part a reasonable sum as compensation for their services, as such trustees; which compensation shall not exceed the sum of three thousand dollars per annum to each of the parties of the second part.

" IV. To hold all the rest and residue of the said proceeds and avails for the use and benefit of such of the several persons holding and owning shares in the capital stock of the said Credit Mobilier of America, on the day of the date hereof, in proportion to the number of shares which said stockholders now severally hold and own, and for the use and benefit of such of the several assignees and holders of such shares of stock at the times herein set forth for the distribution of said residue and remainder of said avails and proceeds, who shall comply with the provisions, conditions and limitations herein contained, which are, on their part, to be complied with.

" V. To pay over, on or before the first Wednesday in June and December in each year, or within thirty days thereafter, his just share and proportion of the residue and remainder of the said proceeds and avails as shall be justly estimated by said trustees to have been made and earned as net profits in said contract during the preceding six months to each such shareholder only in said Credit Mobilier of America who, being a stockholder in the Union Pacific Railroad, shall have made and executed his power of attorney or proxy irrevocable to said several parties of the second part, their survivors and successors, empowering them, the said parties of the second part, to vote upon at least six-tenths of all the shares of stock owned by said shareholders of the Credit Mobilier of America in the capital stock of the Union Pacific Railroad Company on the day of the date hereof, and six-tenths of any stock in the Union Pacific Railroad Company he

may have received as dividend or otherwise, because or by virtue of having been a stockholder in said Credit Mobilier of America, or which may appertain to any shares in said Union Pacific Railroad Company which have been so assigned to him at the time or times of the distribution of the said profits as hereinafter provided; and this trust is made and declared upon the express condition and limitation that it shall not enure, in any manner or degree, to the use or benefit of any stockholder of the Credit Mobilier of America who shall neglect or refuse to execute and deliver unto the parties of the second part his proxy or power of attorney in the manner and for the purpose hereinbefore provided, or who shall, in any way, or by any proceedings, knowingly hinder, delay or interfere with the execution or performance of the trust and conditions herein declared and set forth; and the above transfer and conveyance of said contract is made upon these further trusts and conditions, to wit:—

" 1. That said parties of the second part, their survivors, and successors, trustees as aforesaid, in all their acts and doings in the execution and performance of said contract, and in the execution of their several trusts and conditions herein set forth, shall act by the concurrent assent of four of their number expressed in writing, or by yea or nay vote, at a meeting of said trustees, either or both of which shall be recorded in a book of the proceedings of said trustees, kept for that purpose by their secretary, and not otherwise.

" 2. Said parties of the second part shall keep an office in the city of New York, for the transaction of the business incidental to said trust. Meetings of said trustees may be held, &c.

" 3. The said trustees shall appoint a competent person as secretary, who shall keep a faithful record of all their acts, &c.

" 4. The said trustees shall cause a monthly statement to be made, showing the amount due from the Union Pacific Railroad Company on account of work done, or equipment or material furnished under the contract, according to the estimate of the engineer of the Union Pacific Railroad Company, as provided in said contract, a copy of which statement shall be furnished to the Credit Mobilier of America.

" And the above transfer and conveyance of said contract is made upon the further trust and condition:—

" First. That in case of the death, declination, &c., or absence from the country for the space of six months, or neglect of said trust for the same time by either said trustee, the remaining or surviving trustees may declare the place of such trustees to be vacant, and fill such vacancy by vote, in manner aforesaid.

" Second. That in case any one of said trustees shall wilfully neglect or evade the performance of his duties as such trustee, or shall wilfully attempt to hinder, delay, obstruct or interfere with

17 P. F. SMITH—16

the execution or performance of said contract, or the due execution or performance of said trust or condition, according to the true intent thereof, or shall appropriate to his use or benefit any money or other valuable thing belonging to or appertaining to said trust-fund or property, he shall not be entitled further to act as such trustee or to receive any of the benefits of said trust, either as shareholder in said Credit Mobilier of America, or otherwise.

" The parties of the second part do hereby accept the said trust, and agree faithfully to execute and perform the same according to the terms, conditions and limitations herein set forth.

" The party of the third part, in consideration of these premises, hereby agrees to advance, as upon a loan, to the said parties of the second part, their survivors and successors, all such sums of money and at such times as may be necessary to enable said trustees economically and promptly to execute and perform the conditions of said contract upon the call of said parties ·of the second part, their survivors and successors, such sums, never to exceed in the whole the amount provided for in said contract to be paid by the Union Pacific Railroad Company for the execution and performance thereof, and to receive therefor interest at the rate of seven per centum per annum, payable semi-annually on each sum so advanced, until the same are repaid. And the said party of the third part do further agree for the consideration aforesaid, and for an amount equal to two and one-half per cent. on the amount to be by them advanced, to be paid to them as commission, to and do hereby guaranty unto the parties of the first and second parts the due performance and execution of said contract according to its terms and conditions, and to indemnify and hold harmless the said parties of the first and second parts of and from all cost, liability, loss or damage to them or either of them arising from or on account of said contract, and to the faithful performance of the agreements, contracts and conditions herein above specified to be done and performed by each.

" And this conveyance and transfer is made upon the further trust and condition :—

" That the trustees shall adjust and pay over to the Credit Mobilier of America such portion of the net profits of the work done and material furnished on the first 100 miles west of the 100th meridian, as was done and performed prior to January 1st 1867.

" In witness, &c."

Also, extracts from the minutes of the trustees, December 12th 1867, viz. :—

" Mr. Bushnell offered a resolution that the treasurer, Benjamin

[Credit.Mobilier *v.* Commonwealth.]

E. Bates, be authorized and instructed to procure from The Union Pacific Railroad Company at least $2,000,000 of their first mortgage bonds, and purchase an equal amount of full-paid stock of said company: Provided, Said amount shall be found due on account of the contract, and whenever the owners of full-paid stock in the Union Pacific Railroad Company shall have signed a written approval of the contract between said company and Oakes Ames, then a division shall be made to the holder of the stock of the Credit Mobilier of America, say 60 per cent."

Also, receipt to trustees under Ames's contract, of dividends, paid by them to the stockholders of the Credit Mobilier, December 12th 1867 :—

"Received of Thomas C. Durant, &c., the sums set opposite our respective names in full of the dividends declared December 12th 1867, under and pursuant to the foregoing contracts, and payable on the 3d day of January 1868, and we do hereby severally, in consideration of the amount so received by us, consent to and approve of the foregoing contracts, and agree severally to be bound by and conform to all the terms and conditions of said agreement, and we do hereby release the said Thomas C. Durant, Oliver Ames and their associates from all liability, personally or otherwise, by reason of their acts as parties to said foregoing triplicate agreement.

| Names. | Stock, U. P. R. R. | Stock, Cr. Mobilier. | Dividend, 1st Mort. Bonds, U. P. R. R. Co. | Dividend, Stock U. P. R. R. | Date. | Signature. |
|---|---|---|---|---|---|---|
| O. W. Barnes, | 30. | 15. | 900. | 900. | Jan. 16th '68. | O. W. Barnes. |

Then followed the rest of the names, &c.

### Receipts, &c., January 3d 1868.

"Received of Thomas C. Durant, &c., the sums set opposite our respective names in full of the dividend declared January 3d 1868, under and pursuant to the foregoing contracts, and payable the 3d day of January 1868, and we do hereby severally, in consideration of the amounts so received by us, consent to and approve of the foregoing contracts, and agree severally to be bound by and conform to all the terms and conditions of said agreement, and we do hereby release the said Thomas C. Durant, Oliver Ames and their associates from all liability, personally or otherwise, by reason of their acts, as parties to said foregoing triplicate agreement."

Names, &c., as in former receipt.

Also, receipt, &c., June 17th 1868 :—

"Received of Thomas C. Durant, Oliver Ames, &c., the sums set opposite our respective names in full of the dividends declared June 17th 1868, under and pursuant to the foregoing contract, and

[Credit Mobilier *v.* Commonwealth.]

payable on the 17th day of June 1868, and we do hereby severally and in consideration of the amount so received by us, consent to and approve of the foregoing contract, and agree severally to be bound by and conform to all the terms and conditions of said agreement, and we do hereby release the said Thomas C. Durant, Oliver Ames and their associates, from all liability, personal or otherwise, by reason of their acts as parties to said foregoing triplicate agreement."

Names, &c., as before.

Defendants gave evidence that Duff acted as a trustee in place of John B. Alley, who went to Europe.

Also, agreement dated July 3d 1868, viz. :—

"Whereas, a certain agreement in writing, tripartite, dated October 15th 1867, was made by and between Oakes Ames of the first part, Thomas C. Durant, &c., of the second part, and the Credit Mobilier of America of the third part, unto which agreement reference is hereby made. And whereas the said parties of the second part, in pursuance of a stipulation contained in said contract, have called on party of the third part to advance moneys necessary to enable said parties of the second part, economically and promptly to execute and perform the conditions of a certain contract in said agreement mentioned, and the said party of the third part being unable to make such advances has made default therein; now in consideration of the premises and of one dollar to said party of the third part paid, &c., and for divers other good and valuable considerations it thereto moving, the said party of the third part does hereby assign, &c., to said parties of the second part, all and singular the right and interest of the said party of the third part in said agreement, saving and excepting all such sum and sums of money as now are actually owing by said parties of the second part, to said party of the third part; and the said parties of the second part in consideration of the premises, hereby release and discharge said party of the third part of and from all duty and obligation to make such advances or any advances whatsoever under said agreement."

Also another contract of same date, viz. :—

"Whereas a certain agreement in writing, tripartite, dated October 15th 1867, was made by and between Oakes Ames of the first part, Thomas C. Durant, &c., of the second part, and the Credit Mobilier of America of the third part, unto which agreement reference is hereby made.

"And whereas, in and by said agreement the said parties of the second part are made trustees of certain trusts therein expressed and declared, and among said trusts it was therein provided, that the rest and residue of certain proceeds and avails should be held by the said trustees, for the use and benefit of such several persons holding and owning shares in the capital stock of said Credit Mobilier of America, on the day of the date of said agreement,

[Credit Mobilier *v.* Commonwealth.]

in proportion to the number of shares which said stockholders at that date severally held and owned, and for the use and benefit of such of the several assigns and holders of said shares at the time in said agreement set forth, for the distribution of said residue and remainder, who shall comply with the provisions, conditions and limitations, in said agreement contained, on their part to be complied with, and should be distributed to such complying stockholders and assigns in the manner and proportions and at the times in said agreement expressed.

"Now it is mutually agreed by and between said party of the first part, said parties of the second part, and said party of the third part, and also by the undersigned stockholders of the Credit Mobilier of America, that the said agreement be and the same hereby is amended, &c., in the following particulars, viz.: All the trusts in favor of stockholders of the Credit Mobilier of America, and assignees of stockholders thereof, are hereby transferred to and vested in the following persons, in the shares and proportions annexed to their respective names, that is to say:

| *Name.* | *Parts.* |
|---|---|
| ALLEY, JOHN B., | 290 |

(Here followed a list of names, &c.)

"And all dividends and payments by said agreements directed or provided to be made to the stockholders of the Credit Mobilier of America, shall be made to so many and such of the persons above named and with the proportions above specified, as shall comply with the provisions, conditions and limitations, in said agreements contained, to be complied with on the part of such stockholders and assignees.

"The said agreement in all other respects remains in force as to the trusts therein expressed and declared concerning said residue.

"In witness whereof, the said parties of the first, second and third parts, have executed these presents the 3d day of July 1868, and the undersigned stockholders and assigns of stockholders of the Credit Mobilier of America, have given their consent to and joined in this present agreement and instrument by subscribing the same.

(Signed)　　　　　　　　　　OAKES AMES,
　　　　　　　　　　　　　　THOS. C. DURANT,
　　　　　　　　　　　　　　SIDNEY DILLON,
　　　　　　　　　　　　　　C. S. BUSHNELL,
　　　　　　　　　　　　　　JOHN DUFF."

Also receipt of same date, signed by the stockholders:—

"Received of Thomas C. Durant, &c., the sums set opposite our respective names in full of the allotment declared, July 3d 1868, under and pursuant to the foregoing contract, and payable on the 3d day of July 1868, and we do hereby severally, in con-

[Credit Mobilier *v.* Commonwealth.]

sideration of the amount so received by us, consent to and ap-
prove of the foregoing contract, and agree severally to be bound
by and conform to all the terms and conditions of said agree-
ment, and we do hereby release the said Thomas C. Durant,
Oliver Ames and their associates from all liability, personal or
otherwise, by reason of their acts as parties. to said foregoing
agreement, or either of them, and we agree to pay such rateable
sums as said trustees may call for, not exceeding the amounts so
received, to enable them to complete the construction contract.

| Names. | Parts. | Dividends in Bonds. | U. S. Rev. Stamp. | Date. | Signatures. |
| --- | --- | --- | --- | --- | --- |
| Alley, John B. | 290 | 21,750 | Stamp. | | John B. Alley. |
| Ames, Oakes | 1955 | 146,625 | " | | Oakes Ames. |

Also receipt of 8th July 1868 :—
"Received of Thomas C. Durant, &c., the sums set opposite
our respective names, in full of the allotment declared, July 8th
1868, under and pursuant to the foregoing contract, and payable
on the 8th day of July 1868, and we do hereby severally, in
consideration of the amount so received by us, consent to and
approve of the foregoing contract, and agree severally to be
bound by and conform to all the terms and conditions of said
agreement, and we do hereby release the said Thomas C. Durant,
Oliver Ames and their associates from all liability, personal or.
otherwise, by reason of their acts as parties to said foregoing
agreement or either of them.

| Names. | Parts. | Dividends in Cash. | | Date. | Signatures. |
| --- | --- | --- | --- | --- | --- |
| John B. Alley. | 290 | 8700 | U. S. R. St. | | John B. Alley. |
| Oakes Ames. | 1955 | 58,650 | " | | Oakes Ames by Oliver Ames, At'y. |

The same mode of dividend was pursued afterwards.
Defendants gave in evidence also :—
　　Statement of the affairs of the defendants, showing:
November 30th 1867.　Assets .　　.　　.　　.　$3,748,547.13
　　　　　　　　　　Liabilities　.　　.　　.　　　425,592.49
　　　　　　　　　　　　　　　　　　　　　　　3,322,944.64

[Credit Mobilier *v.* Commonwealth.]

| | | | | | |
|---|---|---|---|---|---|
| Capital stock | . | . | . | . | $3,522,700.00 |

| | | | | | |
|---|---|---|---|---|---|
| November 30th 1868. | Assets . | . | . | . | 3,498,819.17 |
| | Liabilities | . | . | . | 788,680.62 |
| | | | | | 2,710,138.55 |
| Capital stock | . | . | . | . | 3,750,000.00 |

The defendants called John B. Alley who testified, amongst other things, that in July 1868 a call under the contract was made by the trustees on the defendants, who were not able to respond in consequence of litigation against them which had impaired their credit ; and it became necessary to make the agreement of July 3d 1868. The parties agreed that they would make the advancements; they did so, and from that time the defendants made no further advances and had no further interest ; the other parties advanced according to their means ; the two Ames advanced nearly $3,000,000 ; the dividend last mentioned was not in fact paid, it was certificates of mortgage-bonds of the railroad company to be issued as soon as practicable; the company was never in a condition to pay; the nominal dividend in 1868 was $9,628,125, the actual value was about half that amount.

The defendants then proposed to prove by Roland G. Hazard that there was a refusal by the parties concerned to transfer the Oakes Ames contract to the Credit Mobilier—and that in consequence of this the transfer was in fact made to the trustees for the persons interested, of whom the Credit Mobilier was not one, and had no prior interest, and was to obtain none but the interest on advances and commissions as stipulated in the contract that was made.

Plaintiff objected to the offer—it was rejected by the court and a bill of exceptions sealed.

The defendants offered also to show that the same parties who received the profits made under the contract of October 1867 were interested in the Oakes Ames contract before the making of that contract.

This offer was objected to by the plaintiff, rejected by the court and a bill of exceptions sealed.

The defendants having closed, the Commonwealth gave in evidence the following paper produced by the defendants on call :—

" Whereas, A certain agreement in writing in three parts, dated October 15th 1867, was made by and between Oakes Ames of the first part, Thomas C. Durant, Oliver Ames, John B. Alley, Sidney Dillon, Cornelius S. Bushnell, Henry S. McComb, and Benjamin E. Bates, trustees, of the second part, and the Credit

[Credit Mobilier *v.* Commonwealth.]

Mobilier of America of the third part; unto which agreement reference is hereby had and made. Now it is. mutually agreed by and between the said several parties of the first and second parts, that the said parties of the second part shall be, and they hereby are authorized in their discretion, from time to time to purchase stocks, bonds, notes, obligations or securities of the Union Pacific Railroad Company, or derived or obtained from said Company; and also to sell, pledge or dispose of such a like stock, bonds, notes, obligations or securities, and also to borrow money, make loans, and do all other things which they may deem necessary or proper to the carrying on of their business and duties as assignees and trustees of the construction contract in said agreement mentioned, and for the benefit of the persons entitled to the profits of said contract; provided the same be without recourse to or personal liability against the said party of the first part, dated July 7th 1868.                    OAKES AMES,
                                      THOS. C. DURANT,
                                      SIDNEY DILLON,
                                      C. S. BUSHNELL,
                                      JOHN DUFF,
                                      B. E. BATES.

" The undersigned hereby assents to ratify and confirm the several foregoing agreements.        B. E. BATES, Treasurer."

The defendants than gave evidence that some of the names signed to this agreement were not stockholders in the Credit Mobilier.

The following are the plaintiff's points and their answers:—

1. If the jury find from the evidence that the allotments were made to defendant's stockholders, as set forth in the auditor-general's settlement of date, July 14th 1869, the verdict should be for the plaintiff for the amount claimed.

Answer : " If dividends were made to the stockholders of the defendant they are subject to a tax as prescribed by the Acts of Assembly for the actual amount thereof—no more, no less."

2. If the jury find from the evidence that the true intent of the papers of July 3d 1869, was to deprive the Commonwealth of her taxes, the said papers should be disregarded.

Answer. " The law would be as stated in this point, if there were any facts in the case to sustain it."

3. If the jury find from the evidence that at the time of the execution of the papers of July 3d 1868, large dividends had been earned by the corporation defendants, the state cannot, by reason of anything contained in said papers, be deprived of the taxes to which she would otherwise have been justly entitled ; and this whether the intent of the parties executing, was or was not to deprive the state of her taxes.

[Credit Mobilier v. Commonwealth.]

4. A profit earned by a corporation and divided by trustees amongst the stockholders, for all the purposes of taxation, must be regarded as if the corporation had itself declared the dividends.

5. Upon a question of taxation, it is immaterial whether the profits earned by a corporation are divided amongst its stockholders by the corporation or trustees.

6. If the jury find from the evidence that dividends were paid to persons who were stockholders in the corporation defendant, in the proportion of the stock held by them in said corporation, it is immaterial whether the dividends were so received by them as stockholders or as individuals.

These points were affirmed.

7. The paper of 7th of July 1868, is an admission that the contract of October 15th 1867 was still in full force, and the rights of defendants stockholders, were therefore unaffected by the papers of July 3d 1868.

Answer: "If the dividends referred to in the receipts of July 8th 1868, were substantially earned before the Credit Mobilier was released from its contract on the 3d day of July 1868, they are to be taken into consideration, in estimating the taxes due the same, as if declared before the 3d of July, and may fairly be considered as earned under the contract of October 1867, if the jury is satisfied that such was the fact."

The defendants' points and answers were:—

1. If the profits divided belonged to the corporation, or were their profit, or they had an ownership in them, the capital stock is taxable on the basis of such profits, but not otherwise.

Answer: "This point is correct."

2. The contract of October 15th 1867, does not transfer the stock to the company defendants; and by it they were entitled only to such profits as were derived by the defendants under the contract, which are interest and commissions only.

Answer: "We consider from the contract referred to in this point, the defendants stockholders had an interest in the profits earned beyond interest and commissions only, as stated in our general charge."

3. A receipt of profits under the name or description of stockholder, unless derived from the corporation, or out of its property, is not a ground for taxing the corporation.

Answer: "A receipt of profits by the stockholders, unless through the instrumentality or under the name or credit of the corporation, would not subject it to taxation; but if derived substantially through it, or its credit or contract, although paid over by a trustee or third person, would be in law considered a dividend of the corporation, and as such subject to the payment of taxes."

4. If the defendants are liable then it is to be on the basis of

[Credit Mobilier *v.* Commonwealth.]

the actual value of the dividends at the time they were received by the persons described as stockholders.

Answer: "We consider this point substantially correct, as stated in the general charge, where the dividend is not made in money, but of something of less than its actual value—and no valuation fixed on it in the dividends declared, unless the article divided proves valueless, contrary to the expectation when made, in which case there can be equitable relief from taxation on the object divided which proves valueless."

The court (Pearson, P. J.) charged:—

"The case for your consideration comes into court by appeal from the decision of the accounting department, which charged this corporation with a tax of one-half mill on each one per cent. of dividends made by it to its stockholders between the 12th of December 1867 and the 8th of July 1868, amounting to $481,406.25 with 10 per cent. penalty for failing to make report as required by law, forming an aggregate of $529,546.87. The defendant was incorporated by virtue of an Act of Assembly, approved the 1st day of November 1859, by the name of 'The Pennsylvania Fiscal Agency;' and at an after-time had its title changed to that of the 'Credit Mobilier of America,' after one of the great corporations of France. 'This was under a statute enacted on the 26th day of March 1864. By its original charter this company had full power to borrow money and transact other business incident to similar corporations, but its authority was greatly enlarged under the Act of February 28th 1867, when it apparently had in view the loan of its credit, and guarantying the performance of the contract to which your attention will be directed. The corporation was created by the legislature of Pennsylvania, and was required to keep an office in this state, which was done in point of form merely, as all of its business was transacted in the cities of New York or Boston, where its stockholders mainly resided. The evidence shows that Mr. Oakes Ames had entered into a contract to construct a large portion of the Pacific Railroad and Telegraph Line, commencing at the one hundreth meridian of longitude and running westwardly, the making of which would cost a large sum of money, and the risk incurred would be very considerable, which he was said to be unwilling to incur, and therefore desired to place this corporation between himself and danger. He was a heavy stockholder in this company, and it is in proof that many other stockholders were interested with him in the Pacific Railroad. It may be fairly inferred from the whole evidence that Mr. Ames, to avoid individual responsibility, entered into the contract with the Credit Mobilier of the 15th day of October 1867, on the construction of which this case mainly turns. The article recites the fact that Mr. Ames had agreed to construct the road, would require an advance of

[Credit Mobilier v. Commonwealth.]

large sums of money to enable him to effect it, that this corporation could control large amounts of capital, was authorized by its charter to advance and loan money in aid of such enterprises, and was willing so to do, provided it had sufficient assurance that the money should be faithfully applied. That it was willing to make the advances and guaranty performance, on an assurance of being repaid with interest, and a reasonable commission, and to secure this, certain trustees as parties of the second part, were agreed on, into whose hands the money to be received from the Pacific Company was to go for distribution. To effect this, Mr. Ames transferred over his right and interest in the contract, to those trustees who held the same, to secure the performance of the agreement of the Pacific Company; also to reimburse themselves, and pay to the Credit Mobilier its advances and interest, with commissions, &c.; pay their own compensation as agreed on for services, and 'fourth, to hold all the rest and residue of the said proceeds and avails, for the use and benefit of such of the several parties holding and owning shares in the capital stock in the 'Credit Mobilier of America,' on the day of the date hereof, in proportion to the number of shares which said stockholders now severally hold and own, for the use and benefit of such of the several assigns and holders of such shares of stock at the time herein set forth, for the distribution of said residue and remainder of said avails and proceeds, who shall comply with the provisions and limitations herein contained, which are on their part to be complied with.' It is the duty of the court to construe all writings, and the jury is bound by our construction. We say that the plain meaning of this clause of the article requires the distribution of the proceeds and avails of the business and profits thereof, which shall come into the hands of the trustees, to be made among the stockholders of the 'Credit Mobilier,' in proportion to the amount of stock held by them respectively at the time of the distribution, and that it has the same effect to all legal intents and purposes as if made by the officers of the corporation, as to the amount of taxes to be paid to the commonwealth. It is said however, that this was not the intention of the parties, but that it was designed to be divided among the stockholders of the 'Credit Mobilier,' in proportion to the stock which they respectively held in the Pacific Railroad Company. If such was the design, it certainly is nowhere so expressed in the writings. There is no allusion to the holders of such stock, except for another and very different purpose as set forth in the fifth clause, where it is stated, that 'the share of net profits shall only be paid to such shareholder' in the Credit Mobilier, who being a stockholder in the Union Pacific Railroad, shall have made and executed his power of attorney or proxy irrevocable to said several parties of the second part, their survivors and successors,

[Credit Mobilier *v.* Commonwealth.]

empowering them, the said parties of the second part, to vote upon and cast sixth-tenths of all the shares of stock owned by said shareholders of the 'Credit Mobilier,' in the capital stock of the Union Pacific Railroad Company; the residue of this division is to the same general effect. It is very obvious that there is nothing herein expressed showing that the dividend is to be made to the stockholders in the Union Pacific Railroad, but it is to be withheld from those who being stockholders in the Credit Mobilier, and also in the other company, shall neglect or refuse to give their power of attorney or proxy to the trustees to *vote* upon certain portions of the stock in all elections to be held by the Union Pacific Company. From this, we may fairly infer that the stockholders in the Credit Mobilier wished to be able to control the elections in the other company, at least, so far as any member thereof held stock in the Union Pacific Company. It is true, they provide for those who may afterwards become shareholders in that company by virtue of having been a shareholder in the 'Credit Mobilier,' from which it might be inferred, that there was some understanding between the two companies not divulged to us, or apparent on the writings; but this is not to overturn the plain import of the fourth division. We cannot destroy the obvious meaning of a writing by mere conjecture. All of the provisions of the section merely tend to secure the proxies to the trustees, and it is very clear that none of them operate on a stockholder in the 'Credit Mobilier,' unless he also holds stock in the Union Pacific Company. Such person would demand his dividend without executing any writing whatever. If further evidence of the intention of the parties to this article were wanting we find it expressed in another part of the instrument which provides for monthly statements, showing the amount due from the Pacific Company for work done, materials furnished, &c., under the contract, a copy of which is to be given to the 'Credit Mobilier.' Why this statement, if that company was not interested in the contract, and entitled to the profits thereof? Again, the trustee who acts unfaithfully or does anything to hinder or delay the performance of the contract is debarred from acting further as such, and is to receive no benefit from the trust, 'either as a shareholder in said Credit Mobilier or otherwise.' It may perhaps be conceded that there is an apparent contradiction in the statement of the interest which the 'Credit Mobilier' has in the contract to construct the Pacific Railroad. In one part of the article it is very clearly stipulated that it is to have the net profits to divide among its stockholders. In another, that it is to have interest on the money advanced to carry on or to complete the work, with a premium of two and one-half per centum for guarantying its performance, and indemnifying and saving harmless the first and second parties from all losses, but

stipulating that it shall not be required to advance more money than the sum to be paid by the Pacific Company for completing the work; at the same time it is agreed that the trustees shall adjust and pay to the corporation defendant, for such portion of the work done and material furnished on the first one hundred miles west of the 100th meridian, as was done and performed prior to January 1st 1867, a time long anterior to the date of the article. From the whole tenor of this writing we come to the conclusion that the 'Credit Mobilier of America,' was entitled to all the net profits made in the contract, entered into by Oakes Ames with the Pacific Railroad Company for the construction of the work. It has been asked what interest then had Mr. Ames and those trustees in the contract, if the whole profits were to go to the 'Credit Mobilier?' We answer, that they were the principal stockholders in the corporation. Whatever went to it enriched them, at the same time the company stood between them and all danger, and by its credit furnished the means of carrying on the work. If there was a loss it fell on the corporation, no one could lose more than his own stock. There was no individual responsibility. Mr. Ames did not jeopardize his private fortune (said to be very large) in the undertaking. It may have been considered that, in any event, the corporation would receive its loans and premiums out of the business, and the residue also if a profit was made. If further evidence were wanting that the proceeds and avails of the contract between Mr. Ames and the Pacific Company were to be applied by the trustees named in the contract of the 15th of October 1867, 'to the use and benefit of the several persons holding and owning shares in the capital stock of the Credit Mobilier of America,' we find it contained in the article of agreement of the 3d day of July 1868, where it is again distinctly announced as the intention of the contract of October 1867. With all of these written declarations it is impossible to establish by parol that there was a mistake in the writings, and that the profits were to be divided among merely such stockholders in the Credit Mobilier as also held shares in the Pacific Company, and in proportion to their interest in the last-named corporation. The books clearly show that the profits were divided, from time to time, among the stockholders of the 'Credit Mobilier,' and if some few of them never received any dividends, it is fair to infer that it was because they failed to make the application. They are probably yet entitled to their share. That question is not, however, before us, but must be settled between them and the officers of the corporation or the trustees. It seems that there was another contract entered into between these same parties on the 3d day of July 1868—whether before or after the one last above recited is not in proof—by which the agreement of October 1867, was to be rescinded on account of

[Credit Mobilier *v.* Commonwealth.]

the inability of the 'Credit Mobilier' to advance more money. Which of the two articles was first in point of time is wholly unimportant, as there is a saving in this agreement in favor of the defendant 'of all such sum and sums of money as now are actually owning by said parties of the second part to said party of the third part.' There is no pretence that any money was earned after that time which comes in question in the present case, and the last dividend among the stockholders was made on the 8th day of July 1868. Being earned and due to the shareholders, it is equally subject to taxation with the other sums, though not made for five days after the contract was rescinded. It has been seriously contended that these dividends were not declared by the corporation, and the profits from which made were not in the regular course of its business as such. We have already instructed you that when made by these trustees it is the same to all legal intents as if done by the regularly constituted officers of the 'Credit Mobilier.' A company of men incorporated under our law cannot avoid the payment of taxes by naming third persons to transact their business, receive the profits thereof, and divide them among the stockholders. The business out of which these large profits was made to the stockholders is clearly within the enlarged powers conferred on this corporation by the Act of February 28th 1867. The court having ruled that all of these dividends are to be considered in estimating the value of the capital stock, which is to be measured thereby, the jury will have to determine the amount thereof, and by that the taxation will be regulated. It seems, from the books of the corporation and the whole evidence in the case, that the dividends were of four distinct objects: cash, bonds, stocks and certificates. As to the first named there can be no difficulty. The bonds divided among the stockholders were those of the 'Union Pacific Railroad Company,' and doubtless taken on the contract for work done. They were estimated in making the dividend at eighty-five cents on the dollar. Some of the witnesses for the defendant say that at the time they were worth in the market but about seventy-five cents on the dollar. That, in our opinion, is unimportant. The bonds must be estimated by the jury at the value fixed on them at the time of making the dividend; that was the price at which they were given and taken. The Commonwealth, in collecting her taxes, cannot be affected by outside values, but can hold the corporation and its stockholders to the price agreed on, as between the parties and the state, it is in the nature of an estoppel as against them. The state would not be bound by an undervaluation, but could show that the bonds were worth more; the corporation and its stockholders are bound. The same rule applies to the stock dividends. They were of the Union Pacific Company, and estimated at 35 cents on the dollar, said now to have been

worth less money, not more than 20 to 25 cents on the dollar. You will compute the stock as valued by the company and its stockholders in making the dividend. The certificates stand in a different situation; you have heard the evidence on that subject, and if you believe it, and there is nothing to contradict the statement of the witnesses, it shows that this company and its trustees supposed that the earnings amounted to $2,390,625 more than was actually earned or could ever be received. Acting on the supposition that the money was due and owing, and that the bonds of the Pacific Company would be given in payment, the trustees issued certificates to the stockholders in the 'Credit Mobilier' to that amount. It was afterwards ascertained that nothing was coming, the certificates were worthless, and the dividends mere 'moonshine.' As the stockholders could realize nothing from them, they should not, in our opinion, be treated as a dividend. Corporations, like individuals, can be relieved against a plain mistake, or a consideration which wholly fails. If you are satisfied that these certificates were valueless, you can with great propriety leave them out of your estimate in assessing this tax. That is a question for the jury under the evidence. It cannot be denied but that this corporation, in making its return of the value of its capital stock, which is to be rated according to the amount of its dividends, wholly failed to report any part of the profits made out of this contract with the Union Pacific Company in which it was interested, and is therefore subject to the penalty of 10 per cent. on the amount so omitted; you will, therefore, after ascertaining the tax due at the time of the settlement, add the penalty thereto as required by law. This whole sum bears interest at the rate and from the time fixed by the statute to which we have directed your attention."

Both parties excepted to the charge and the answers to the points.

The verdict was for the Commonwealth for $407,483.39.

The defendants took out a writ of error. They assigned for error the answers of the court to the points and the rejection of the offers of evidence.

*R. C. McMurtrie* and *B. R. Curtis* (of Massachusetts), for plaintiffs in error.

*L. W. Hall* and *F. Carroll Brewster*, Attorney-General, for the Commonwealth, defendant in error.

The opinion of the court was delivered, July 7th 1870, by

AGNEW, J.—The case before us stated briefly, is this: Oakes Ames was the owner of a construction contract with the Union

Pacific Railroad Company, by which he undertook to build six hundred and sixty-seven miles of their railroad.   He then entered into a tripartite contract with seven trustees of the second part, and the Credit Mobilier of the third part.   The trustees agreed to build the road and receive the price, and pay over the surplus profits to the persons who were the stockholders of the Credit Mobilier in the proportion of their stock.   The Credit Mobilier agreed to furnish the funds for construction at seven per cent. interest, and to guaranty the execution of the contract by the trustees for a commission of two and a-half per cent.   Oakes Ames, on his part, assigned his construction contract to the seven trustees, and agreed that they should receive the price of construction, and pay over the profits to the stockholders as stated. The trustees under this tripartite agreement paid to the persons who were the stockholders of the Credit Mobilier over nine millions of dollars in cash and securities, as profits, between the 15th of October 1867 (the date of agreement), and the 3d of July 1868. The Commonwealth claiming that these profits belonged to the corporation, and were in effect dividends declared by it, imposed a tax under the Act of May 1st 1868, upon its capital stock, measured by this supposed dividend, and settled an account in the auditor-general's office accordingly.   The company appealed from this settlement, contending that the profits were *not dividends of anything belonging* to the corporation, but were derived from the construction contract owned by Oakes Ames, assigned to the stockholders in their individual right.   The court below decided the case upon the terms of the tripartite contract alone, and refused to hear evidence to show in whom the right of property in the construction contract actually was.   In arriving at this conclusion, the court below seems to have overlooked or disregarded the fact that the tripartite contract did not by its terms vest any right of property to the construction contract or its profits in the Credit Mobilier, but by its express words conveyed this right to the trustees for the use of the persons who were the stockholders of the company.   On the face of the paper Oakes Ames, and not the Credit Mobilier, was the owner of the construction contract, and consequently of its profits.   They could vest in another, therefore, only by his transfer.   As the rightful owner of the construction contract from which the profits were derived, he could transfer them to whom he chose.   By his agreement he assigned them, not to the corporation, but to the trustees, for the use of the persons who were its stockholders.   If the Credit Mobilier, therefore, had any title to the profits, it arose, not from the terms of the tripartite agreement, but from facts not recited.   It is evident, that any title the Credit Mobilier might have, could be shown only by proving that Oakes Ames held the construction contract as its trustee, or that his assignment was intended, under

the guise of a trust for the stockholders, to vest the title in the
company.    This intention might be shown by facts drawn from
the agreement and from external evidence.    The Commonwealth
cannot be deprived of her tax by any contrivance to conceal the
title of the corporation to the profits; and on the other hand, it is
the right of the corporation to show that the title was not in it,
but was vested by the true owner in the persons who are its stock-
holders in their individual right.    If we examine the tripartite
agreement we discover that every part of it, excepting the fourth
and fifth clauses of the trust conditions, contradict the title of the
company.    The recitals expressly declare the title to the con-
struction contract to be in Oakes Ames, the reasons for his assign-
ment of it to the trustees, and the purpose and consideration
inducing the Credit Mobilier to enter into the tripartite agree-
ment.    The operative clauses pass the title from Ames to the
trustees, and not to the company, and stipulate for the only com-
pensation the company shall receive for the performance of its
undertaking.    The fourth and fifth clauses in the conditions of the
trust are therefore reached with an avowed intention adverse to
any title in the corporation, and it then becomes necessary to
ascertain whether the language of these clauses is in conflict with
the other parts of the agreement.    The fourth clause is, " to hold
all the rest and residue of the said proceeds and avails for the use
and benefit of the several persons holding and owning shares in
the capital stock of the said Credit Mobilier of America on the
day of the date hereof, in proportion to the number of shares
which said stockholders now severally hold and own, and for the
use and benefit of such of the several assignees and holders of
such shares of stock at the times hereafter set forth for the distri-
bution of said residue and remainder of said avails and proceeds,
who shall comply with the provisions and limitations herein con-
tained, which are on their part to be complied with."    The fifth
clause then provides for the times, terms and conditions of pay-
ment to each stockholder.    In declaring that the proceeds shall
be for the use of the " several persons" holding and owning shares,
the fourth clause vests the right to the proceeds in the individuals
thus described, while it measures the quantum of their right by
the extent of their stock.    It does not flatly contradict the other
parts of the agreement.    The most we can say of it is, that its
meaning is not clear, but depends on facts not apparent on the
face of the agreement.    If the real truth of the case was, that
Oakes Ames held the construction contract in trust for the Credit
Mobilier before entering into the tripartite agreement, or if the
actual intent of the parties, not intended to appear in the agree-
ment, was that the Credit Mobilier should be the real purchaser
of the construction contract or its profits, we would arrive at the
conclusion that the fourth clause was but a disguised mode of giving
17 P. F. Smith—17

[Credit Mobilier *v.* Commonwealth.]

the benefits of the contract to the Credit Mobilier in a division of profits among its stockholders. But if neither was the fact, and if the persons who are the stockholders were associated with Oakes Ames in the construction contract, and made use of the corporation to effectuate their own purposes, we would perceive at once that the fourth clause did not vest the title to the proceeds in the corporation, but was a mere mode of measuring the proportion to which each associate was entitled. In the former case the profits would inure to the use of the corporation and become the basis of the tax imposed by the Commonwealth on the capital stock; while in the latter the profits being individual solely, no tax could be laid on this basis. It is evident, therefore, that the question was one of fact or intention, as the case might be trust or purchase, to be derived from evidence within and without the agreement. There were inferences to be drawn from the agreement, not without force, in leading the court to the conclusion that the true intent was to vest the title in the corporation under the form of a distribution to its stockholders. The agreement recites no title in the stockholders or consideration moving from them as a reason for vesting the profits in them; while if Oakes Ames was the sole owner of the construction contract, as the instrument declares, no consideration would seem to move him to part with an interest so valuable as this was, except that from the Credit Mobilier, set forth in the second preliminary recital. The trustees were to get only their salaries. When we add to this the agreement of the trustees to account directly to the company for the profits on the work and material furnished before the 1st of January 1867 on the first hundred miles west of the 100th meridian, and the covenant of the Credit Mobilier to advance funds and guaranty the performance of the contract, the facts produce an impression that the net profits were intended for the benefit of the corporation. These were facts for the consideration of a jury, and hence it was the right of the defendants to give evidence that the same persons who were to receive the net profits under the tripartite contract were interested along with Ames in the construction contract, and that the corporation had no interest of its own, but was actually refused a participation in it.

Without considering the errors assigned in detail, it will be seen from what has been said, that the court below erred in rejecting the evidence of all those facts which tended to prove that the Credit Mobilier was not interested in the construction contract, and in holding in the charge and answer, that the mere effect of the tripartite agreement, was to vest title to the net profits in the corporation itself.

The judgment is therefore reversed, and a *venire facias de novo* awarded.

[*Credit Mobilier v. Commonwealth.*]

The second trial of the case was had December 19th 1870, before Pearson, P. J.

The Commonwealth submitted substantially the same evidence as on the first trial.

The defendants gave in evidence the agreements and other papers submitted at the first trial; also similar oral testimony.

It also appeared from the testimony of their witness, B. F. Ham, on cross-examination, that the parties who received cash dividends from the trustees invested the money in the stock of the Union Pacific Railroad Company.

The defendants called John B. Alley, who testified:—

" In fall of 1867 I was a director and stockholder in Union Pacific Railroad; I was also a director in the Credit Mobilier; also on executive committee; after this Hoxie contract terminated I was one of those engaged in making the contract with Oakes Ames; I am the person named as a trustee; the first 247 miles to 100th meridian were built under the Hoxie contract; it was originally taken by Hoxie, and assigned to the Credit Mobilier; the men engaged in building the road were large capitalists; and were willing to engage in the work; most of them believed it would be a profitable investment; Ames was a very large capitalist; after an unsuccessful attempt to procure capital, Ames wished me to engage with him in the enterprise; this was in the summer of 1865; wanted his name associated with it, as he regarded it as the great enterprise of the age, that if properly managed would be made profitable; he was willing to risk some money, but not all; he risked a million in it; it was said there was a corporation in Pennsylvania that could be obtained, the Credit Mobilier; it was thought that the road could be built without affecting personal liability; they then got the contract assigned from Hoxie to Credit Mobilier; this was in May or June 1865; I went into the business August 1865; the Credit Mobilier took the Hoxie contract to build to 100th meridian; they took it, and Ames and others put their money into the stock of Credit Mobilier, intending to build the road through it, to avoid personal liability; T. C. Durant was elected president of Credit Mobilier, and his friends were put into the direction and intrusted with the chief management; Durant was also vice-president and chief manager; they built the road to 100th meridian, when the Hoxie contract expired; then the propriety of continuing the contract with Credit Mobilier was discussed, but no conclusion arrived at; it was the design and wish to make a new contract with Credit Mobilier, and build the road by and through it; a contract was positively made with J. S. M. Williams in spring of 1867, early; it was not fully executed; this was designed to have been turned over to Credit Mobilier if certain legislation could be procured; some dissatisfaction grew up

[Credit Mobilier *v.* Commonwealth.]

as to Durant's immense power and his management; he held so much power in both corporations, virtually controlling both; the Ames party was entirely opposed to his controlling both corporations; 19th May 1867, the Ames party, holding a very large proportion of the stock of Credit Mobilier, turned Durant out of the corporation; he was very indignant, used very rough language, said the Credit Mobilier should never have another contract, and should never build another mile of the road; he had opposed the Williams contract, and procured an injunction, though there was great dissatisfaction; Durant and his friends said Credit Mobilier should never have another contract or do anything in Union Pacific Railroad; contest lasted probably three months; we tried to persuade them to let the Credit Mobilier have the contract to avoid personal liability; we thought we could put it through ourselves if necessary, but preferred using the corporation to avoid personal liability; the executive committee of the Union Pacific Railroad was building the road without a contract; all parties said it was disastrous to their interests; every one had confidence in Mr. Ames, and they agreed to make a contract with him, which he agreed to take; then the contract of August 16th 1867 was made; then we had more disputes; went on three months longer; then Durant and his party, in October 1867, were turned out of Union Pacific Railroad; all parties then agreed to compromise, and the agreement of October 15th 1867 was executed; Ames took the contract entirely unconditionally; he had the right to dispose of it as he pleased; the paper of October 15th was fixed on because the parties were the same who were interested in the Hoxie contract, and were all stockholders in the Union Pacific Railroad Company, almost in the exact proportion that they owned stock in the Credit Mobilier, and as by this mode of division all became personally liable, and it was desired to avoid that liability; the Credit Mobilier was not interested directly or indirectly with Oakes Ames in the contract of August 1867, nor in the contract of October 1867, other than as expressed in the agreement of that date. Ames was personally liable, and it was desirable to obtain the personal liability of all the parties in interest with him, so as to hold them liable with him to the extent of their interest. The reason Ames transferred the contract was, that when he made the contract, whilst he had the absolute and unconditional right to dispose of the contract as he chose, yet it was felt by the parties in interest, who were his old associates in the execution of the Hoxie contract, that there were equitable rights and considerations by which those parties were to have in some form and some proportion an interest in that contract, and they had implicit confidence in Mr. Ames, that he would not disregard any proper equitable interest which those individuals should have,

and it was the understanding that it should receive the assent of the stockholders in the Union Pacific Railroad Company, and the executive committee of the Union Pacific Company.

"Ames further desired to relieve himself from all personal liability as far as he could, and whilst the Credit Mobilier did that to a certain extent, for which it was to receive a commission, its capital being about $3,500,000, and the contract being $47,000,000, it was not regarded as a sufficient and full protection, and the parties in interest themselves, individually, being worth over $30,000,000, as they were really to receive the profits, and the responsibility was so vast, it seemed no more than reasonable that we should all come in and share with him as well the risk as the advantages. Those were the reasons affecting him as he stated. I don't mean to say that he said this in words, but such was the understanding among us at the time. The reasons for dividing among the stockholders of the Credit Mobilier was because their interest in the Credit Mobilier represented substantially and almost exactly their interest in the Union Pacific Railroad, and their interest in the Hoxie contract; and therefore that was as equitable a basis as it could be decided upon, and altogether the most convenient, because it saved a great deal of labor and was very convenient, and almost the only convenient form in which transfers of interest could well be made. These are all the reasons I heard spoken of at the time. I received dividends under the contract from the assistant treasurer of the trustees, Mr. Crane. Those dividends were all paid in accordance with this statement, except that of July 3d 1868, of Union Pacific Railroad bonds amounting to $2,390,025. The trustees had issued certificates on an estimated profit amounting to this sum. Those certificates were issued prematurely; the amount was not earned; the certificates should not have been issued, and were never redeemed by bonds; the trustees afterwards issued a notice to every individual holding them. The matter was ultimately compromised. A circular was issued to the stockholders that if they would come and subscribe stock to enable them to raise the money, they would acknowledge the certificates to the amount of 80 per cent., and did issue bonds to that amount, not mortgage-bonds. It was to be issued to those who made the certificates; a good many never were acknowledged; these bonds were not issued to any one but those who made the subscription."

The defendants offered to show, that the rescission of July 3d 1868 was, in truth, founded on the reason recited in that paper, viz., that there was a demand made for advances by the Credit Mobilier, according to the contract of October 15th 1867, and that the corporation could not make the advances, and hence the rescission was made.

[Credit Mobilier *v.* Commonwealth.]

This was objected to by the plaintiff, rejected by the court, and a bill of exceptions sealed.

On cross-examination the witness testified :—

" I was a stockholder in Union Pacific Railroad during the time that dividends were made. I think I had about 500 shares; I bought and sold; some held in trust for others; some of it cost me $30; none I ever owned cost me more than that; I first got shares in spring of 1866, in Union Pacific Railroad; on 3d January 1869, I owned not far from 2000 shares, a little over that; was buying and selling some; not much; on 1st January 1868, I owned 500 or 600 shares; on 17th June 1868, I probably owned 1500 shares, but cannot recollect with certainty; I traded very little in comparison with some others; shifted my position in both Credit Mobilier and Union Pacific Railroad; a small dealer and small owner. On 3d July 1868, I got a dividend according to my stock, $22,000, probably 220 shares, 1720 in all perhaps. On 1st January 1868, I had, I think, 290 shares in Credit Mobilier; a few days before had sold some; paid for 40 shares par; 250 shares paid $160 for. I bought the 40 shares in May or June 1867; bought the 250 shares in December 1867; I think, bought from T. C. Durant; the 40 from Mr. Gray, of New York; sold some to Peter Butler, for $200 per share; I think, within three or four days of the time I bought the 250 shares, beginning of 1868 probably; sold 150 shares, I think, at different times; got about $75; autumn of 1867 par value was $100; I bought, I think, 54 or 55 shares in Credit Mobilier, from Oakes Ames; he transferred it last March, but we bargained for it, I think, May 1867. On July 1st 1867, I held 290 shares of stock in Credit Mobilier. * * * No one had any legal interest in the contract with Ames in August 1867. * * * I knew Hoxie. There was no agreement to divide the profits that I ever heard of, except what appears in the papers. I was informed that the stockholders who signed the dividend receipts were personally liable. I always regarded them as liable. The trustees were liable before, and the stockholders responsible for the money received. I understood we were all liable to Oakes Ames and the trustees, and bound to hold them harmless and we became responsible on account of the receipts. Whether on the agreement or on what we had agreed, we would be personally liable all around. This was the opinion of Mr. Tilden. I went on my own account. * * * We had no legal hold on Ames to make him do it. * * * No consideration to Ames other than is mentioned in the paper of October 1867, for the transfer. I received the dividends in proportion to the stock I held in Credit Mobilier. It was in exact proportion to the stock I held as the agreement states. I received no dividends but under this agreement, except two of 6 per cent. from the Credit Mobilier direct; for those it paid tax. I think a small portion was

earned by the Credit Mobilier on the Hoxie contract. The profits on the 58 miles were paid over to the Credit Mobilier in the form of a million of dollars of stock of the Union Pacific, and I got my portion of that; paid, I think, in December 1867. It made up the 12 per cent. dividend for two years, and the tax was paid on that, I think. * * * I think the tax on 12 per cent. was paid, and that was all that was earned. The dividends never made to me after November 1867—none known by me to have been earned. I have received considerable stock dividends under this contract in dispute. * * * We considered the certificates good; they were issued in good faith, but were issued prematurely. When divided they were thought to be good; I expected to receive bonds for them but never did; on their face were conditional; I had some, could probably have raised money on them; I don't know that any one did; they ought not to have sold them; I surrendered mine; subscribed money; got 80 per cent.; but all I got would not repay me the money I had to advance; I settled mine about a year ago; possibly 18 months ago; I surrendered mine, I think, after the trial of this case before; I did not then speak of the 80 per cent.; it had not accrued, I think; do not believe that the arrangement was made; it had been talked about as the trustees were very uneasy; I did not consider it fair or just to hold the trustees responsible, as they issued in good faith. No one but Ham had charge of the business of the company, Assistant Treasurer; Dillon, President; know of no financiering; no money paid out by it on any contract; nothing to pay. * * * The money was demanded of the Credit Mobilier to enable them to go on with the contract in July 1868. This was the only demand made that I know of. Ames's contract was completed in October or November 1868."

There were two injunctions issued, January 23d and May 21st 1867, against the railroad company, restraining them from extending the Hoxie contract, then controlled by the defendants, and from making a contract with them.

The defendants read the depositions of Oakes Ames, Sidney Dillon, John Duff and Thomas C. Durant, taken upon a commission.

The 18th interrogatory was:—

"Look at the agreement of October 15th 1867, and state whether you know, and if so, state why it was that the persons who were to receive the dividends of the profits earned under the construction contract of August 16th 1867, were defined or described as stockholders of the Credit Mobilier. State whether the corporation defendants gave any consideration or price for this mode of division, and whether it arose from any interest in or ownership of the profits by the corporation."

To this interrogatory T. C. Durant answered:—

[Credit Mobilier *v.* Commonwealth.]

" One reason why that definition or description was used was that the Credit Mobilier, having been engaged in the construction of the road to the 100th meridian, a distance of about 247 miles, had during the process of construction, by subscription to the stock and purchase, become possessed of a large quantity of stock of the Union Pacific, which they had disposed of to their shareholders proportionate to the amount of stock they held in the defendant corporation, and it was found that a large majority of the stock of the Union Pacific was then held by said shareholders of the Credit Mobilier in such proportionate quantities that it was thought that a division predicated of the amount of stock held in the Credit Mobilier at the time would, for all practical purposes, answer the same purpose as a division of the profits according to the interest each individual held in the stock of the Union Pacific Railroad Company, and at the same time facilitate a transfer of the interest from one party to another, as the capital stock of the Credit Mobilier was fixed at 37,500 shares or parts, while that of the Pacific was liable to be increased from time to time—in other words, for convenience. At the same time there were stockholders, mostly of stock on which instalments had not been paid, who would be amply protected in their rights to any portion of said interest by the condition that the said contract and agreements should receive their assent, of which right they availed themselves, and either consented to the contract or sold their interest, all or nearly all of them. It was thought at the time that a division into parts would be attended with a great deal of trouble more than there would be if the profits were allotted in that way. Another reason was, that the proposed agreement provided that the said parties should give their proxies to vote for directors for six-tenths of all the stock they then held, or might acquire, in the Union Pacific, to the seven trustees, as set forth in the contract. Another reason was, that at the time the agreement of October 1867 was drawn up, they were all in a hurry, because the attorneys were anxious to leave, and one of them obliged to leave town, and their using the description adopted in that paper saved the delay of procuring an accurate stock-list. The corporation gave no consideration or price for this mode of division, and it did not arise from any interest in or ownership of, the profits by the corporation. It was agreed upon between Mr. Ames and the trustees, more as a matter of convenience than anything, without consulting or advising with the corporation defendant."

In answer to another interrogatory he said :—

" August 8th 1864, the Union Pacific Railroad made a contract with H. M. Hoxie for the construction of a hundred miles of its road, which contract was afterwards extended to the 100th meridian, making 247 miles. The carrying on of this contract

subsequently passed into the hands of the Credit Mobilier of America, and under their direction the same was completed in the summer of 1866; the contract price was $50,000 per mile. Subsequently to the completion of the said 247 miles, or about the time thereof, the subject of another contract with the Credit Mobilier was spoken of. The price heretofore paid was considered too large by the president, General Dix, the government directors and others, and no proposition was either made or accepted by the Credit Mobilier for the further construction of the road at that time. I was at that time vice-president of the Union Pacific Railroad, and had general charge of its affairs pertaining to construction, and continued the construction of the road after the 247 miles were finished in the summer or fall of 1866, by the advice of the President, for the account of the Union Pacific Railroad. There were so completed in the year 1866, under a contract made by me, 58 miles of road, and the same accepted by the government as complete. The board of directors did, by a resolution subsequent to that time, extend the Hoxie contract so as to embrace the 58 miles so completed. It was on this resolution that the company were enjoined January 23d 1867, and they rescinded the resolution. The construction of the road in the spring of 1867 was still continued for account of the road, although at the time it was thought that some proposition might be made for the construction of a large portion of the road by the Credit Mobilier assuming existing contracts for work done west of the 100th meridian, and might be accepted. In constructing this road for the company, some of the iron which was used was iron sent out for account of the Credit Mobilier. In March 1867, J. M. S. Williams made a proposition for a contract to construct the road from the 100th meridian, 267.57 miles, having entered into a written agreement to transfer the said contract, if he procured it, to the Credit Mobilier, which proposition was subsequently accepted by vote of the board of directors of the Union Pacific Railroad, and which they were prevented from carrying out by the injunction of May 21st 1867. In August 1867, the contract with Oakes Ames was agreed upon, with the express understanding that the same should receive the sanction of the stockholders of the Union Pacific Railroad or be wholly invalid. At the time of making the contract of October 15th 1867, it was claimed by the friends of the Credit Mobilier that their corporation was entitled to some consideration in consequence of having kept themselves in readiness to go on with the contract, and of having commenced making arrangements under the supposition that they should get the contract granted to Mr. Williams, and also to the fact that they were large creditors of the Union Pacific Railroad. Under these considerations and the fact that the Credit Mobilier was a large stockholder in the Union Pacific Rail-

[Credit Mobilier *v.* Commonwealth.]

road, and that on a large portion of the stock of the Union Pacific Railroad owned by the Credit Mobilier, only 30 per cent. had been paid, and knowing that it was in the power of the Credit Mobilier, by virtue of its owning stock in the Union Pacific Railroad, to prevent the contract with Oakes Ames from being consummated, by refusing to approve the same unless some satisfactory arrangements were made by them, I as one of the trustees agreed to this stipulation as a compromise, and I presume that others were influenced by similar notions, as it settled all matters. I further state that in consequence of these injunctions some feeling had arisen between the two companies, and I believe that even if the injunction had been removed it would have been impossible for the Credit Mobilier to get a contract from the Union Pacific Railroad, nor do I believe that any better terms could have been obtained than were obtained by the clause quoted in the question by way of compromise."

In answer to the general interrogatory he said:—

" [After the last injunction had been served on the company several attempts were made to agree upon the parties to have the contract and upon the prices to be paid for the same; among others the names of John B. Alley and H. C. Crane were proposed; these not being agreed upon, a proposition was made by Oakes Ames, which was accepted, it first being stated to the board that such a contract would be satisfactory to the larger stockholders in the road, many of whom had been seen, and that the consent of all the stockholders would be obtained; the board passed a resolution accepting the proposition and instructing the executive committee to settle the details of the contract; the contract was drawn up in form, and prior to any meeting of the executive committee the same was submitted to four persons who were members of the executive committee, for their signatures approving the same, in order, if the details were not satisfactory, the same might be altered and the contract put in proper shape before the meeting of the executive committee when it was to be acted upon; the members who signed this paper were Oliver Ames, C. S. Bushnell, Springer Harbaugh, Thomas C. Durant,— Mr. Harbaugh, the government director, noting on the same page a reference to a letter to the board of directors from Mr. Williams, another government director, relative to some portion of the work, giving the company an option, I believe, to extend this contract to Salt Lake, which he wished the executive committee to consider; I also noted under my signature that I approved the contract, subject to the approval of the stockholders as understood by the board; on the 1st of October 1867, at the first meeting of the executive committee held subsequently, the contract was found entered on the minutes of the board, with the names of the four parties referred to as having approved the

same, but without the objections of either Mr. Harbaugh or myself being noted; Mr. Bushnell offered a resolution affirming the contract as it was; it was rejected; a resolution was then offered in the following words: 'Resolved, the foregoing contract between the Union Pacific Railroad Company and Oakes Ames, referred to the executive committee by a resolution of the board August 16th 1867, to settle the details, be approved, and that the proper officers of the company be instructed to execute the same, subject, however, to the written approval of the stockholders of the company, as understood by the board of directors when the same was voted upon;' this resolution was passed; this occurred the day previous to the election of directors of the Union Pacific, and the fact that the said contract was on the books prior to the meeting of the executive committee indicated an attempt on the part of the friends of the Credit Mobilier to secure the contract for themselves, whether the stockholders of the Union Pacific assented or not; the next day at the election the friends of the Credit Mobilier attempted to get control of the road, and for that purpose changed the by-laws, appointed new tellers or inspectors, and proceeded to open the polls; the regularly appointed inspectors also opened the polls; part of the stockholders voted in one hat and part in the other, and each ticket was declared elected; an injunction was served the next day, enjoining the parties elected by the friends of the Credit Mobilier from acting as directors, and the offices, books, and papers were held in the possession of the parties elected on the other ticket."]

"Subsequently an Act of Congress was passed ordering a new election, the affairs of the company being carried on in the mean time by the old board by a compromise, by tacit consent of most of the parties interested. A feeling was engendered in this contest that led many of the stockholders of the Union Pacific to determine that in no event would they consent to any contract that was to be under the control of or in which the profits should enure to the benefit of the Credit Mobilier, or should be conducted by them as agents, or in which the payments should be made or received through them, and they did not assent to said contract or the agreement of October 15th [until they had obtained the opinion of counsel that under said agreement the profits on the contract would not enure to the benefit of the corporation defendant]."

The portions of the deposition in brackets and other testimony not important to specify, was rejected by the court and bills of exceptions sealed.

The other witnesses testified substantially to the same facts as Alley and Durant.

The plaintiff, the Commonwealth, requested the court to charge:

I. That if the jury find from the evidence that the allotments

[Credit Mobilier *v.* Commonwealth.]

were made to the defendant's stockholders, as set forth in the auditor-general's settlement, of date July 14th 1869, the verdict should be for the plaintiff for the amount claimed.

II. If the jury find from the evidence that at the time of the execution of the papers of July 3d 1868, large dividends had been earned by the corporation defendants, the state cannot, by reason of anything contained in said papers, be deprived of the taxes to which she otherwise would have been justly entitled; and this, whether the intent of the parties executing them was or was not to deprive the state of her taxes.

III. That a profit earned by a corporation and divided by trustees amongst the stockholders, for all the purposes of taxation must be regarded as if the corporation had itself declared the dividends.

IV. That, upon a question of taxation, it is immaterial whether the profits earned by a corporation are divided amongst its stockholders by the corporation or its trustees.

V. That if the jury find from the evidence that dividends were paid to persons who were stockholders in the corporation defendant in the proportion of the stock held by them in said corporation, it is immaterial whether the dividends were so received by them as stockholders or as individuals.

VI. That the papers of 7th July 1868, are an admission that the contract of October 15th 1867, was then in full force "for the benefit of the persons entitled to the profits" under said contract, who were the "several parties holding and owning shares in the capital stock in the Credit Mobilier of America."

VII. That if the jury find from the evidence that the dividend of July 3d 1868, consisting of 75 per cent. bonds of the Union Pacific Railroad Company at 85 per cent., amounting to $2,390,625, was "*made or declared*," as charged in the auditor-general's settlement of July 14th 1869, the right of the Commonwealth to her tax thereon attached, and she cannot be affected by any subsequent arrangement between the party declaring and the person receiving said dividend.

VIII. That the defendants are confined to their specification filed with their appeal, and that no one of said specifications presents as an objection, that the dividend of July 3d 1868, was not taxable by reason of the certificates having been issued prematurely, or that the amount thereof was not earned.

IX. That the agreement of October 15th 1867, recites no title in the stockholders or consideration moving from them as a reason for vesting the profits thereof in them, and as the instrument declares, and the uncontroverted proof in this case shows, that Oakes Ames was the sole owner of the construction contract, and that he parted with his interest therein to the Credit Mobilier for the consideration set forth in the second preliminary recital, there

[Credit Mobilier v. Commonwealth.]

is no testimony in the case from which a jury could infer that the defendants are not liable for the taxes claimed in this case.

X. There are inferences to be drawn from the agreement, not without force, leading the jury to the conclusion that the true intent is to vest the title in the corporation under the form of a distribution to its stockholders.

XI. The agreement of the trustees to account directly to the company for the profits on the work and material furnished before the 1st of January 1867, on the first one hundred miles west of the 100th meridian, and the covenant of the Credit Mobilier to advance funds and guaranty the performance of the contract, produce a powerful impression that the net profits were intended for the benefit of the corporation. These are facts for the consideration of the jury.

XII. A corporation cannot accept the benefits conferred by its charter and repudiate its obligations. And the act of incorporation and supplements thereto having authorized the defendant to do what was done in this case under agreements or arrangements with others, the corporation is responsible, and the plaintiff need not inquire into the contracts or arrangements between the defendant and its agents or other parties.

The court answered the Commonwealth's points as follows:—

" 1. We cannot instruct the jury as requested. The finding by the auditor-general is of no importance when appealed from; and the Supreme Court has decided that the allotment among the defendant's stockholders does not give the fund to the corporation, when the assessment of the contract, out of which the profits were made, was to trustees and not to the company.

" 2. If dividends had been earned, to which the corporation defendant was entitled, there is nothing in the contracts of the 3d of July 1868, which would or could deprive the state of its taxes on those dividends.

" 3. If the profits were earned by or belonged to the corporation, the dividends being made by trustees instead of by the officers of the company will make no difference in law. They will be equally subject to taxation.

" 4. The law is so, as stated in the answer to the 3d point.

" 5. As we understand the decision of the Supreme Court, this case does not turn on that question, but, on how the money divided was owned. If it never belonged to the corporation, but was divided by the trustees among the men as *individuals* who were stockholders, although in proportion to the amount of their stock, it is not subject to taxation by the Commonwealth.

" 6. We are unable to see that the agreement of the 7th of July 1866 has the slightest bearing on the case.

" 7. If the certificates for the bonds valued at 75 cents on the dollar were issued by the officers of the company under a mistake

when no money was earned, the company may be relieved from paying a tax thereon. If, since then, bonds were accepted at 80 cents on the dollar (although under a new arrangement), the equitable relief asked cannot be allowed. It is only on the ground of clear mistake and a total failure of consideration that such a defence is admissible, For a further explanation of this subject, see the general charge. We consider the specification sufficient.

" 8. This matter *is sufficiently specified* in the 7th and 9th specifications as filed.

" 9. There is no title stated to be in the stockholders of the Credit Mobilier in the agreement of the 15th of October, and no consideration shown as moving from them to Oakes Ames which could induce him to part with his interest therein to them, nor is there anything in that writing, as we understand the decision of the Supreme Court, by which he parted with his interest in that contract to the Credit Mobilier, but the same was transferred to trustees; not for the use of the corporation, as declared by that court, but for the benefit of certain stockholders therein, among whom the profits were divided in proportion to the amount of their stock, and therefore the same is not the subject of taxation, although in our opinion the consideration of that transfer moved from the corporation itself in its guaranty of the contract.

" 10. The law is as stated in this point. The jury must consider all the branches of that contract, as also the others given in evidence, with all the facts proved on each side, in making up their opinion whether the intention was or was not to give that contract to the corporation under the form of a distribution to its stockholders.

" 11. The facts recited in this point should be taken into careful consideration, as also the clause in the article requiring monthly accounts to be rendered to this corporation, together with all the parol and other evidence on both sides, and from the whole the jury must conclude whether the profits were intended for the corporation or its stockholders in proportion to the amount of their stock. If for the corporation, those profits are subject to taxation. If the corporation was to have no interest, but the stockholders only, then, according to the decision of the highest court in the state, the tax cannot be assessed.

" 12. A corporation must take the burden imposed by its charter with the benefits conferred. This corporation had the power to make contracts or guaranty those made by others, or agree to advance its money to other persons or companies. The state had a right to infer that when dividends were made among the stockholders of one of its corporations in proportion to the amount of their stock, it was of profits belonging to the corporation, and tax it accordingly. But it may be shown that the profits were not so made, but were of money coming from another source, never

[Credit Mobilier *v.* Commonwealth.]

belonging to the corporation, and that the dividends among them were as individuals, and not as stockholders, though in proportion to the amount of their stock; and when so shown, the amount cannot be taxed as dividends."

The defendants asked the court to instruct the jury:—

1. The burden of proof lies on the Commonwealth to show that the dividends, in respect of which the tax is claimed, were made by the corporation defendants.

2. The Commonwealth cannot recover if the dividends made by the trustees under the assignment of October 15th 1867, of the construction contract of August 16th 1867, which are the grounds on which the tax is claimed, were not dividends of profits belonging to the Credit Mobilier.

3. There is no proof that the Credit Mobilier had any interest, prior to the deed of assignment of October 15th 1867, in the contract out of which the profits arose which were divided.

4. The contract being on its face made with Oakes Ames, unless he acted for the Credit Mobilier in making it, and was either their agent or trustee, that corporation did not acquire any right to the contract or its profits at the time the same was made.

5. There is no proof in the cause from which the jury can infer that there was any trust or agency in Oakes Ames for the Credit Mobilier, which vested a title to the construction contract in that company or its profits at the time it was made.

6. The first instrument that connects the Credit Mobilier with that contract is the assignment to the trustees.

7. That instrument on its face does not vest any interest in the contract in the Credit Mobilier, nor does it on its face make the dividends of the profits by the trustees dividends of the Credit Mobilier for the purpose of taxation.

8. To entitle the Commonwealth to recover the jury must be satisfied from the evidence that the profits from which the dividends were made came from the property of the Credit Mobilier; and as the dividends came from profits of the construction contract, the jury must find that that contract belonged to the corporation defendant when the profits were earned, to entitle the Commonwealth to recover against it for the taxes claimed in this case.

9. As the parties to the contract have been examined as witnesses in the cause, and have given explanations in regard to it, if the jury believe their statements the defendant was not liable to taxation by reason of the dividends declared by the trustees.

* 10. There is no proof that the defendants owned the contract from whose profits the dividends were made when Oakes Ames held it; the only proof connecting the corporation at all with the contract being the assignment to the trustees, and that assignment

[Credit Mobilier *v.* Commonwealth.]

professes to vest the title in said trustees, and not in the corporation.

11. There is an inconsistency in the contract if the trustees were really trustees for the corporation—

1st. In stipulating for commissions and interest on advances to be made to the trustees by the corporation.

2d. In stipulating that compensation should be made to it for part of the work done by it.

12. If the jury believe that the trustees were not in fact agents of the corporation defendant, and dividing its own property among its own stockholders, but were really dividing property among them which did not belong to the company, nor come from it, but from property which the persons who were stockholders had the right, independently of the corporation, to agree to divide in that way, then the Commonwealth is not entitled to recover.

13. The answer of Ames and others in the McComb Case, states that the persons who ultimately got the profits under the agreement of October 15th 1867 were intended to be interested with him in the construction contract of August 16th, and this paper being put in evidence by the Commonwealth, this statement is thus prima facie evidence of that fact, explains why these persons were made legal owners of the profits by the trust set forth in the assignment of October 15th, and which was in pursuance of an intention existing at the time the construction contract was made.

The court answered the defendants' points, as follows :—

" 1. The law is as stated ; yet when profits are divided among the stockholders in proportion to the amount of their stock, it is a legal presumption that it came from the corporation, yet that may be explained or repelled.

" 2. This is the law as we understand the decision of the Supreme Court as made in this case.

" 3. There is no such proof, or at least very slight, except as to the first hundred miles west, &c., which is also embraced in the Oakes Ames contract.

" 4. The law is as stated. The facts applicable to it are for the jury.

" 5. Whether Mr. Ames did so act or not, must be judged of by the jury from all of the evidence. Some very loose talk is stated as to all the parties in the Hoxie contract being interested, of which this company was one. It is, perhaps, too loose for the jury to rely on with safety, especially as there is a great deal stated by various witnesses to the contrary.

" 6. This we consider the first substantial connection.

" 7. We consider the agreement of the 15th of October somewhat contradictory in its whole character, and as said by the Supreme Court, must all be considered, together with the parol

evidence, in coming to a conclusion. We have to examine all of its provisions, see what was to be done by each party, look to the consideration, the conduct of the parties under it, and, from the whole, come to a conclusion as to what was intended.

" 8. The dividends must come from the profits or business of the Credit Mobilier, or arise from some agreement or contract in which it was interested when the profits were made. The company by its charter had a lawful power to contract. Its guaranty would furnish sufficient consideration; and if it was the understanding at the time that the profits belonged to the company and were to be divided among the stockholders by the trustees, they would then be considered dividends under the Act of Assembly and be subject to taxation. It would be otherwise if the corporation, as such, was not to be interested.

" 9. From the evidence of most of the defendant's witnesses, if believed, the Credit Mobilier had no interest in the contract of August 1867, and if it did not acquire an interest afterwards, cannot be taxed on the dividends among the stockholders, according to the Supreme Court decision.

" 10. As already said, we think the evidence very slight that this corporation was to have any interest in the Oakes Ames contract when held by him. The only proof at all to be relied on of such connection is the assignment of the 15th of October, and what occurred afterwards. That assignment does vest the legal title in the trustees, but the uses and purposes for which it was held must be collected from all of the evidence, written and parol.

" 11. We think that the stipulation for a commission to be paid to the Credit Mobilier is inconsistent with the idea of ownership on the part of the corporation of all the profits. We see no such inconsistency in it stipulating to be paid for that part of the work already done by it.

" 12. The law is as stated in this point, as we understand the decision of the Supreme Court.

" 13. When evidence of the character described is read, it is pretty strong evidence of the fact against the party reading it; not conclusive, but certainly primâ facie evidence of the fact; may be rebutted or explained. In the present case it may be used to explain why the construction contract was made, under what arrangement and who were entitled to its benefits."

The court charged:—

" The case for your consideration comes into court by appeal from the decision of the accounting department, which charged this corporation with a tax of one-half mill on each one per cent. of dividends made by it to its stockholders, between the 12th of December 1867 and the 8th of July 1868, amounting to $481,406.25, with ten per cent. penalty for failing to make report as required by law, forming an aggregate of $529,546.87. The defendant

17 P. F. Smith—18

[*Credit Mobilier v. Commonwealth.*]

was incorporated by virtue of an Act of Assembly, approved the 1st day of November 1859, by the name of 'The Pennsylvania Fiscal Agency,' and at an after-time had its title changed to that of the 'Credit Mobilier of America,' after one of the great corporations of France. . This was under a statute enacted on the 26th day of March 1864. By its original charter this company had full power to borrow money and transact other business incident to similar corporations; but its authority was greatly enlarged under the Act of February 28th 1867, when it apparently had in view the loan of its credit, and guarantying the performance of contracts, to which your attention will be directed. The corporation was created by the legislature of Pennsylvania, and was required to keep an office in this state, which was done in point of form merely, as all of its business was transacted in the cities of New York or Boston, where its stockholders mainly resided. The evidence shows that Mr. Oakes Ames had entered into a contract to construct a large portion of the Pacific Railroad and telegraph line, commencing at the 100th meridian of longitude, and running westwardly, the making of which would cost a large sum of money, and the risk incurred would be very considerable, which he was said to be unwilling to incur, and therefore desired to place this corporation between himself and danger. He was a heavy stockholder in this company, and it is in proof that many other stockholders were interested with him in the Pacific Railroad. It may be fairly inferred from the whole evidence that Mr. Ames, to avoid individual responsibility, entered into the contract with the seven trustees named, and the Credit Mobilier, of the 15th day of October 1867. The article recites the fact that Mr. Ames had agreed to construct the road, would require an advance of large sums of money to enable him to effect it; that this corporation could control large amounts of capital, was authorized by its charter to advance and loan money in aid of such enterprises, and was willing so to do, provided it had sufficient assurance that the money should be faithfully applied; that it was willing to make the advances and guaranty performance, on an assurance of being repaid with interest and a reasonable commission, and to secure this, certain trustees, as parties of the second part, were agreed on, into whose hands the money to be received from the Pacific Company was to go for distribution. To effect this, Mr. Ames transferred over his right and interest in the contract to those trustees who held the same, to secure the performance of the agreement with the Pacific Company; also to reimburse themselves and pay to the Credit Mobilier its advances and interest, with commissions, &c., pay their own compensation as agreed on for services, and fourth, to hold all the rest and residue of the said proceeds and avails for the use and benefit of such of the several parties holding and owning shares in the capital stock in

the Credit Mobilier of America, on the day of the date thereof, in proportion to the number of shares which said stockholders now severally hold and own, for the use and benefit of such of the several assigns and holders of such shares of stock at the time, therein set forth, for the distribution of said residue and remainder of said avails and proceeds, who shall comply with the provisions and limitations therein contained, which are on their part to be complied with. It is the duty of the court to construe all writings, and the jury is bound by our construction. We are in like manner bound by the construction put on the contract by the Supreme Court of the state, and its decisions generally. Mr. Ames being the owner of the contract with the Union Pacific Company, could unquestionably dispose of it as he saw proper, and to whom he pleased, provided he complied with its terms. The Supreme Court has decided that the transfer of this contract, made by the agreement of the 15th day of October 1867, was not to the Credit Mobilier of America, but to the trustees named as the second party, for the use of the persons who were the stockholders in that company; and if the corporation had any interest in the contract it was not from the terms of the tripartite agreement, but from facts not recited. 'It is evident,' says the court, 'that any title the Credit Mobilier might have, could be shown only by proving that Oakes Ames held the construction contract as its trustee, or that his assignment was intended, under the guise of a trust for the stockholders, to vest the title in the company. This intention might be shown by facts drawn from the agreement, and from external evidence.' When this case was before the court on a former occasion, we put a different construction on the writing. We considered that where the credit of a corporation was to be used as a means of raising money, and it was to stand as the guaranty of a large contract, out of which great sums were expected to be realized, and it was to be used as a shield for heavy capitalists in order to prevent danger to their private fortunes, common justice required that it should participate in the profits; and where by contract those profits were to be divided among the stockholders of the corporation in precise proportion to the amount of their stock, it was made the substantial party, although the money realized was to be paid over to trustees to be thus divided, instead of going into the company's treasury to be distributed by its officers. It seems from the decision of the Supreme Court, that we fell into an error in so construing the contract. There is great ground to fear, that hereafter very many corporations created by our laws will so contrive as to have the profits of their business go into the hands of trustees, to be by them divided among their stockholders and never come into the corporation treasury, whereby the state will be defeated in its effort to collect taxes on the company's dividends. We consider that the substance of a profit

[Credit Mobilier *v.* Commonwealth.]

made and divided among the stockholders should alone be looked
to when the state claims its tax, and not the form in which it was
distributed, and whether given out by one hand or another, it
could not escape its share of the public burdens.   Fortunately
for the safety of the state, there can be but few cases like the one
under consideration, else the treasury of the Commonwealth might
be depleted to an unlimited amount.   This apprehension must not
have the slightest weight on your minds in deciding this case.
The Supreme Court has said that this is not a pure and unmixed
question of law, arising on the construction of the writings as
decided by this court, but is a mixed question of law and fact, to
be determined by the jury on the whole evidence, taking into
consideration the words and meaning of the different papers and
various parts of the contracts, which they say, in substance, are in
some extent contradictory or might admit of different explana-
tions, a portion apparently looking in one direction and other parts
in another, the whole to be considered together with the parol
evidence, in order to reach the true intention of the parties.   It
is nowhere said that so far as the agreements have been reduced
to writing, they are not to be construed by the court.   So to declare
would be to contradict a fundamental principle of law.   Then let
us take up the contract of the 15th of October, and construe it
with the aid of the parol evidence and endeavor to ascertain what
the parties intended.   The first part of the recital merely names
the parties, appoints the trustees and speaks of the contractor
requiring a very large and hazardous outlay of capital.   The
second speaks of the Credit Mobilier having authority to make
the arrangement, and being able to control a large amount of
capital, and being willing to lend it, provided there is sufficient
assurance that the money shall be duly expended in the work of
completing the road, and the same applied to reimburse the com-
pany in its loans and advances, with reasonable interest on the
money.   The third expresses the confidence of this corporation
in the profitable character of the contract and its willingness to
guaranty the performance for a reasonable consideration.   The
next expresses the confidence of both corporations in the trustees
and their faithful application of the money to the work, and
division of the proceeds to those justly entitled thereto.   By the
first portion of the agreeing part, Oakes Ames transfers all of his
interest in the contract of the 16th of August to the trustees in
trust, that they shall perform the work as agreed by Ames, and
hold the avails to pay themselves and reimburse the Credit Mo-
bilier their advances and commissions, to pay themselves three
thousand dollars per annum for their services.   The fourth, which
we have always considered the main provision in the article, has
already been sufficiently commented on in the charge.   As we
understood that fourth provision to give the residue of the avails

and proceeds of the contract to those owning shares in the capital stock of the Credit Mobilier, in proportion to their number of shares in the corporation, if they complied with the other provisions of the contract, one of which is in terms contained in the next clause of the article, and we held that ·a gift in that form, and to be thus divided, was in effect a gift or grant. to the corporation, we could not distinguish between the stockholders and the corporation.    The Supreme Court has decided in this case, that there is a manifest distinction, and that this may have been a grant to them as individuals merely, to be divided amongst them in proportion to the amount of their stock, and was not a question of law but of intention, to be collected from all of the facts in the case.    We are all bound by, and must implicitly follow, that decision.    If we understood it to be a peremptory declaration that the corporation had no interest in the contract, we would so instruct you, and it would be your duty to obey.    We do not so understand the opinion, but, on the contrary, that the intention must be collected from all of the agreement as established by writing or parol, and the acts of all the parties in interest.    We must consider this in connection with another provision in the article, that the trustees shall furnish monthly statements of the amount due from the Union Pacific Company for work on agreement, &c., a copy of which statement shall be furnished to the Credit Mobilier.    We naturally ask ourselves—Why furnish this to the corporation if it had no interest in the work or proceeds thereof ?    On the other hand, it is agreed that the Credit Mobilier is to advance such sums of money as a loan to the trustees as may be necessary to finish the work and to receive therefor interest at the rate of seven per cent., and also two and one-half per cent. on the money to be advanced as commission, to guaranty the performance of the work according to its terms and conditions, and to indemnify and hold harmless the other parties from all cost, liability, loss or damage arising from or on account of said contract, and the agreements and contracts to be performed by each.    It is further agreed that the trustees will adjust and pay over to the Credit Mobilier such portion of the net profits of the work done or materials furnished on the first one hundred miles west of the one hundredth meridian as was done and performed prior to January 1st 1867.    There thus seems to be something difficult to understand in this corporation agreeing to guaranty the performance of the work, and exact a premium of two and one-half per cent. therefor, if it was entitled to have the whole profits divided among its stockholders, and thus far it operates in favor of the defendants.    On the other hand, it is inexplicable that this corporation should furnish all the funds necessary to carry on a great and expensive work and guaranty its performance, when it had no control whatever over its management and

[Credit Mobilier *v.* Commonwealth.]

was to stand between the first and second parties and all risk of danger from loss.

It looks as if those who contracted for the corporation paid no regard to its interest, and only took care to secure the advantage of other parties. We can well account for such an arrangement if the Credit Mobilier was to have all the profits of the work, yet the reading of the contract says that it was to have but $2\frac{1}{2}$ per cent. on the expenditures advanced by it. All of these clauses in the contract, together with the parol evidence, must be carefully considered by the jury. There is one clause in the article on which some stress has been laid, found in No. 5, as to the payment over to each shareholder in the Credit Mobilier of the profits made, who being also a stockholder in the Union Pacific Railroad Company, as shall execute one irrevocable proxy to the trustees to vote, &c., and no stockholder in the Credit Mobilier, who shall refuse to give such proxy, shall receive any of the profits of the work. This we understand to be a method got up to compel the stockholders to furnish the means to certain officers, namely, the trustees named, to retain their power over and places in the Union Pacific Railroad. It has but little bearing on the present case. We will next consider the two agreements of the 3d day of July 1868. The one provides for distributing the profits arising from the contract of the 15th of October among certain persons by name as therein mentioned, instead of the stockholders of the Credit Mobilier, and all the trusts in favor of the stockholders of the Credit Mobilier were thereby transferred and vested in said persons in the shares and proportions annexed to their respective names, and here follows a list of names with the same number of shares annexed to each as the list of stockholders in the Credit Mobilier. Every other provision of the contract to remain in full force. The heading of the receipts is from that time forward changed to 'allotments' of the respective 'parts,' instead of 'dividends declared on the stock of Credit Mobilier,' as practised theretofore. The jury will consider—What was meant by this change? Did the stockholders fear that it would be accounted 'dividends' to 'stockholders' as such? or was the change unmeaning or accidental? Every act must be carefully weighed. These things are not conclusive, especially against explanatory evidence, but must have their weight in determining whether dividends were made among the stockholders of the corporation as such, or merely to the shareholders as individuals down to that time. The settlement is only made down to a few days thereafter, and it may fairly be inferred only of work done to that time. On the same day, we cannot tell whether before or after the article last referred to, an agreement was entered into dissolving all connection between the first and second parties and the 'Credit Mobilier,' 'excepting such sums of money as now are

actually owing by said parties of the second part (the trustees), and the party of the third part.' From that time forward we do not know of any connection between them. We are unable to see that the article of the 7th of July has any bearing upon the case. It is stated by some of the witnesses that the Credit Mobilier was interested in the Hoxie contract some two hundred and fifty miles east of the 100th meridian, and there was due upon it some $2,500,000 never yet settled. That is of no account in the present case, as it was not brought into the settlement at the department, and may raise a claim hereafter. It is mentioned now for another purpose; some of the witnesses testified that the same parties who were interested in that contract were to have an interest in that entered into with Oakes Ames. As we have said in other parts of the charge, perhaps that is too loose for the jury to infer an agreement, especially as the parties subsequently entered into writings. It is conceded by the contract, and verified by parol, that this corporation was interested in the contract for 100 miles of road immediately west of the 100th meridian, and in fact constructed 58 miles thereof, and one witness says that its notes were outstanding for iron for laying a greater length. Whether the corporation was or was not repaid that money is not very clear, unless, as stated, it accepted a million of dollars in full satisfaction of the profits, which was divided among its stockholders, constituting the dividends of 1866 and 1867 of 6 per cent. per annum, on which a tax has already been paid. If there are other moneys still due which should have been divided, you can take it into account, provided you can ascertain the sum. But the evidence on that subject is too uncertain. There is another piece of evidence having some bearing on the ownership of the stock, and the character in which the dividends were made. It is in proof that but 6 per cent. per annum was divided in 1866 and 1867, yet the evidence shows that in the latter part of 1867, and on through the early part of 1868, the capital stock of the Credit Mobilier was buying and selling in the market at $150, $175, and even $200 a share. Was this because the corporation was making and dividing large profits out of the construction of the Pacific Railroad, or was it because the stockholders were receiving it in their individual capacity? The effect might possibly be the same in either way. But one thing is clear, soon after the 1st of July 1868, this corporation was unable to advance money, and it was discovered that it had sunk nearly one million of its capital, though managed by the same men all the time. It looks as if this poor Pennsylvania corporation had strayed off to the city of New York, where, like the wayfarer from Jerusalem to Jericho, it fell among thieves who stripped it pretty effectually. But that has nothing to do with this tax. The stockholders grew rich whilst the corporation became poor. One thing is out of the

[Credit Mobilier *v.* Commonwealth.]

usual order, if these dividends were to be made among the stockholders as individuals, and not by the corporation, or because they were members thereof. That is, that the money is to be divided precisely in the proportion that each person had stock in the Credit Mobilier, whether he held in the Union Pacific Railroad Company or not, and it is conceded that it was not in any proportion they held in the last-named corporation. It is certainly a novel method of dividing, if the corporation did not own the profits, yet a number of respectable witnesses certainly testify that such was the arrangement entered into for convenience of transfer, and because it was about in the proportion that the respective stockholders had advanced their money, or held stock in the Union Pacific, but not precisely so as to either. But whilst the corporation in its capacity as such was to incur all the risk, furnish the money, guaranty the performance of the contract, and stand between the contractor, the trustees, and all danger, it was to have no part of the profits. It guarantied all to the last, unless discharged by the agreement of the 3d of July. We are asked to instruct you that the decision of the Supreme Court establishes that the corporation is not entitled to the profits, but that it goes to the stockholders as individuals. If we so understand the decision, we would, without all of this ceremony, instruct you to render a verdict for the defendant; but we do not so understand it, but, on the contrary, that it is a question for the jury to decide from the whole of the evidence. We instruct you that if the Credit Mobilier received the whole of this money arising from the profits of constructing the Union Pacific Railroad, as a corporation, and divided it among its stockholders as such, it is taxable. If it was received by the trustees to be divided among the stockholders as individuals, it is not taxable, and on that point this case turns; using the name of trustees in making the dividends is unimportant, provided the money belonged to the corporation. If a device of that kind was resorted to for the purpose of preventing taxation by this or any other state in which it is situated, it cannot prevail, being a fraud on the law. It is contended in this case that there was no evidence on which the account was settled which would even permit it to go to the jury. It is late to raise that point after all of the evidence on both sides has been received. If such was the case, the counsel should have objected to the paper when offered. We never permit an account to be read if opposed, without previous evidence of indebtedness. That is generally the return made to the department, but when as here, none was made, the officers can, on the neglect or refusal to produce the account, settle the same ex parte from the last date in their power; and in such cases, if the refusal is persisted in, the party is denied the right of appeal. In the present case Mr. Forster testifies that after

repeated notices this corporation neglected to make any return. A settlement was then made ex parte, and a balance of over two millions struck, of which the officers were notified. They then came forward with all of their books, and contracts as now exhibited, and got the claim reduced to the present sum. All of this is unimportant after the introduction of the evidence, and we only notice it because requested by the defence. If you should find in favor of the Commonwealth, the next question for your consideration is as to the amount due. The rate of taxation, both under the Act of 1859 and 1868, is half a mill on each 1 per cent. of dividend. Where cash was divided there can be no abatement. Where it was in bonds of the Union Pacific Company, it appears that they were computed at 85 cents on the dollar, and where it was in stock, at the rate of 35 cents on the dollar. It was so settled at the department and divided at that rate among the stock or shareholders of the Credit Mobilier. There is one item of $2,390,625, certificates given for bonds which it is said were issued by mistake, where there was no money due, had never been earned, and from the evidence before us on the last trial it appeared that the bonds were never furnished to the holders of the certificates. We therefore advised the jury, if they found against the corporation, to relieve it from that charge. From the evidence on the present trial it appears that a compromise was made since with the Pacific Company, by which these certificates were to be redeemed with bonds, computed at 80 cents on the dollar, though Mr. Alley says it was effected by the holders agreeing to lend the Pacific Company two millions of dollars the premium on which loan he thinks should be very nearly equal to the value of the bonds. Some of the holders, it seems, had previously disposed of their certificates at the par of Pacific bonds, but comparatively a small number. Under these circumstances we cannot recommend relief against this tax. It has been the policy of the state, as settled by the courts, not to go into a nice calculation of the actual value of dividends, but to take them as made by the corporation. Here the certificates were computed at 85 cents on the dollar. They, it is said, were compromised at eighty. The holders may not have realized so much, but many cases of greater hardship have been enforced by judicial decisions; as where a company owning coal-mines has been charged at the full price of its sales, although every ton was exhausting its capital, and the value in the ground was as well known as that in the market. If this was divided at 85 cents on the dollar, you can compute it at that or at 80, as you think right. As this is only an equitable defence which is permitted to be set up against the payment, and the party suffered to show mistake or want of consideration, it may be met and repelled on the trial. Therefore, although the arrangement relative to the certificates was

made pending the action, it is competent to prove *it* and thus repel the defence. This is proved by the defendant's witness, Mr. Alley. If you find for the Commonwealth, you can value these certificates at the sum at which they were computed at the time of making the dividends the same as the other Union Pacific bonds. In that event there has been no material error in the settlement that we can perceive; but that is for you. If there is money due to the state, the corporation is subject to the penalty of 10 per centum on the sum for failing to report. The great and material question is as to the liability or otherwise of the corporation, depending on the facts and principles already stated. If you find against the state, there is a claim to be passed on not mentioned by either party on the argument, probably from matter of policy. It has been shown that the corporation officers had an appraisement made of the stock, and the tax, according to that valuation, amounted to $12,375. This is also subject to the penalty of 10 per cent. for failing to report in time. That valuation was afterwards carried away, but their letter left with Mr. Foster and his evidence fully explain the business; besides, it seems to be admitted by the defendant's specifications on file. You will therefore find in favor of the Commonwealth for that sum, if against it in the larger claim. You must, in any event, compute interest on the amount due the state at the rate of 12 per centum, after two months from the time of settlement, under the Act of 1868. This, with the answers to the points put by the counsel of the respective parties, will give you all the legal light on the case.

"There is one subject having no bearing on the cause trying, to which we consider it our duty to advert. [It seems from the evidence of some of the witnesses that the parties in interest would not suffer any contract to be entered into with Oakes Ames for the construction of the Union Pacific Railroad until he had agreed to share the profits with them. These men were the president, vice-president and directors of the road. We consider every such contract a fraud on the corporation and its stockholders. The transaction is of that nefarious character which should be condemned by the courts whenever it is presented. Any stockholder could, by a bill in equity, compel the parties receiving to divide the profits among all, and we are by no means certain that the government of the United States could not vacate the charter by scire facias. But that must not in the least influence your minds in the present case."

Some time after the jury had retired to consider their verdict, it was shown to the court that nearly all of the stockholders in the Union Pacific Railroad had agreed in writing that the contract of the 16th of August might be awarded to Oakes Ames on the terms mentioned therein, and had, by their receipts after-

wards, ratified the same, and upon the jury coming in with the verdict, the court made the explanation to the jury, showing that such was the case, and that therefore the transaction was perfectly honest. At the same time mentioned that there was no design to reflect on any man who had been a witness for the defendant in the case in speaking of the corporation having fallen among thieves; that they were generally men of high character, and if the corporation had lost a large portion of its capital, as was shown, it might have arisen from imprudent speculations; or, if the men who originally furnished and still owned the stock withdrew it, it was probably what they had a right to do. The jury was then told that if either expressions or statements had the smallest weight on their minds in making up their verdict, they must retire and reconsider it. Whereupon they signified that it had no influence. The verdict was then received and recorded. All of these matters were inserted in the charge at request of defendant's counsel.

The verdict was for the Commonwealth for $636,868.33.

December 27th 1870. Motion for rule for new trial.

February 3d 1871. It is ordered by the court, that on the counsel for the Commonwealth remitting the sum of $26,477.30 from the verdict as rendered, judgment be entered on the verdict, and the motion for a new trial overruled, and on their refusal so to do, a new trial is to be granted.

February 8th 1871. The plaintiff remits from the verdict the sum of $26,477.30.

The defendants took out a writ of error and in a number of specifications assigned for error, the rejections of their offers of evidence, the answers to the points and the whole charge of the court.

---

This writ of error, No. 56 to May Term 1871, was argued May 17th 1871, before Thompson, C. J., Read, Agnew, Sharswood and Williams, JJ., by

R. C. McMurtrie and G. W. Biddle, for plaintiffs in error, and by

L. W. Hall and F. Carroll Brewster, Attorney-General, for Commonwealth, defendant in error.

The opinion of the court was delivered, November 20th 1871, by

Read, J.—The settlement made by the auditor-general and state treasurer, from which the plaintiffs in error appealed, was not founded upon the books and accounts of the company, but upon those of certain trustees, whom they assumed to be really the Credit Mobilier of America, and whose dividends were therefore liable to taxation, as if they had been declared by the corporation itself.

[Credit Mobilier *v.* Commonwealth.]

Upon the first trial, the court below sustained this position taken by the accounting officers, and gave to the jury a binding instruction, as to the contract of October 15th 1867. "From the whole tenor of the writing, we come to the conclusion," said the court, "that the ' Credit Mobilier of America' was entitled to all the net profits made in the contract entered into by Oakes Ames and the Pacific Railroad Company for construction of the work.' "

In reversing the judgment, the Supreme Court said : " Without considering the errors assigned, in detail, it will be seen from what has been said, that the court below erred, in rejecting the evidence of all those facts which tended to prove that the Credit Mobilier was not interested in the construction contract, and in holding in the charge and answer, that the mere effect of the tripartite agreement was to vest title to the net profits in the corporation itself."

The fair legitimate meaning of the contract is directly the reverse of the construction placed upon it by the court below, which led them into a cardinal error. "If," said the court, "there was a loss, it fell on the corporation, no one could lose more than his own stock. There was no individual responsibility. Mr. Ames did not jeopardise his private fortune (said to be very large) in the undertaking."

Mr. Ames was liable personally, for the execution of the whole contract, and always remained so. The trustees became personally liable by the agreement and assignment of October 15th 1867, and the shareholders by the receipt of dividends, and signing the receipts for them.

The true position is, that the contract of the 16th of August 1867, was that of Oakes Ames alone, and he was personally responsible to the Union Pacific Railroad Company for its due execution.

The first 247 miles of the Union Pacific Railroad to the 100th meridian was built under the Hoxie contract. It was originally taken by Hoxie, and by him assigned to the Credit Mobilier, who built that portion of the road.

Oakes Ames, and other large capitalists who were desirous of building the road, but wished to avoid personal liability, got possession of the Credit Mobilier charter, and put their money into its stock intending to build the road through it to avoid personal liability. T. C. Durant was elected president of the Credit Mobilier, and his friends put into the directory and intrusted with the chief management. Durant was also vice-president and chief manager of the Union Pacific Railroad Company.

They built the road to the 100th meridian, when the Hoxie contract expired : then the propriety of continuing the contract with the Credit Mobilier was discussed, but no conclusion was arrived at ; it was the design and wish to make a new contract with the

Credit Mobilier, and build the road by and through it.   A contract was positively made with J. S. M. Williams in the spring of 1867 early ; it was not fully executed; this was designed to have been turned over to the Credit Mobilier if certain legislation could be procured.   Some dissatisfaction grew up as to Durant's power and his management—he held so much power in both corporations, virtually controlling both.   The Ames party was entirely opposed to his controlling both corporations.   On the 19th of May 1867, the Ames party, holding a very large proportion of the stock of the Credit Mobilier, turned Durant out of the direction.   He was very indignant, and used very rough language, and said the Credit Mobilier should never have another contract, and should never build another mile of the road.   He had opposed the Williams contract, and procured an injunction, though there was very great dissatisfaction.   Durant and his friends said the Credit Mobilier should never have another contract, or do anything in the Union Pacific Railroad.   The contest lasted probably three months.

" We," says Mr. Alley, " tried to persuade them to let the Credit Mobilier have the contract, to avoid personal liability.   We thought we could put it through ourselves if necessary, but preferred using the corporation, to avoid personal liability.   The executive committee of the Union Pacific Railroad was building the road without a contract; all parties said it was disastrous to their interests.

" Every one had confidence in Mr. Ames, and they (the Union Pacific) had agreed to make a contract with him which he agreed to take.   Then the contract of the 16th August 1867 was made.

" The contract was to build 667 miles of railroad and telegraph, commencing at the 100th meridian of longitude, for $47,915,000."

Mr. Ames was to enjoy the benefits of all existing contracts, " and to assume all such contracts and all liabilities of the company accrued or arising therefrom, for work done or to be done, and materials furnished, or to be furnished for or on account of the road west of the 100th meridian, crediting, however, the Union Pacific Railroad Company on this contract all moneys paid or expended on account thereof."

Of the personal liability of Oakes Ames, on this agreement, there cannot be a shadow of doubt.   " Then," said Mr. Alley, " we had more disputes—went on three months longer.   Then Durant and his party, on the 2d of October 1867, were turned out of the Union Pacific Railroad."

All parties then agreed to compromise, and the agreement of October 15th 1867 was executed.   Ames took the contract entirely, unconditionally, and he had the right to dispose of it as he pleased.   The paper of October 15th was fixed on, because the parties were the same who were interested in the Hoxie contract,

[Credit Mobilier *v.* Commonwealth.]

and were all stockholders in the Union Pacific Railroad Company almost in the exact proportion that they owned stock in the Credit Mobilier. The Credit Mobilier was not in any way interested, directly or indirectly, with Oakes Ames in the contract of August 16th 1867.

Ames was personally liable, and it was desirable to obtain the personal liability of all the parties in interest with him, so as to hold them liable with him, to the extent of their interest.

"Mr. Ames desired to relieve himself as far as he could, and, while the Credit Mobilier did do that to a certain extent for which it was to receive a commission, its capital being about $3,500,000, and the contract being $47,000,000, it was not regarded as a sufficient and full protection, and the parties in interest themselves being worth over $30,000,000, as they were really to receive the profits, and the responsibility was so vast, it seemed no more than reasonable that we should all come in and share with him the risk as well as the advantages."

The testimony of the witnesses, including Oakes Ames himself, proves conclusively, that he was the real owner of the contract of the 16th of August 1867, and that no other person had any interest in it whatever.

That the Credit Mobilier was neither legally nor equitably the owner of the contract of the 15th of October 1867, and had no other interest in it except what is clearly set forth on its face.

That the contract was assigned to trustees for the benefit of individuals, who, upon the receipt of dividends, became personally liable.

Under the Hoxie contract, its stockholders—that is of the Credit Mobilier—were not personally liable. Under the agreement of the 15th of October 1867, the trustees and their *cestui que trusts* were all personally responsible and liable, and were not shielded by the charter of the Credit Mobilier.

The intention of Oakes Ames and of all the parties to the agreement of the 15th of October 1867 being that the Credit Mobilier should have no control over the contract of the 16th of August 1867, or its execution, and no interest in the former, except what is clearly set forth in it, we will examine it, to see whether their intention was carried out.

We must recollect, it was determined the contract should not in any event be assigned to the Credit Mobilier.

The capitalists who executed the Hoxie contract through the Credit Mobilier, held stock in that company in proportion to their several and respective interests in the contract, for this corporation was owned by them, and the capital provided by the purchase of shares by each individual engaged in the enterprise.

The interest, therefore, of each stockholder, was according to the number of shares he held, and as a large majority of the stock of

the Union Pacific was then held by said shareholders of the Credit Mobilier in such proportionable quantities, it was thought that a division predicated of the amount of stock held in the Credit Mobilier at the time, for all practical purposes, would answer the same purpose as a division of the profits, according to the interest each individual stockholder held in the Union Pacific Railroad Company, and at the same time facilitate a transfer of the interest from one party to another, as the capital stock of the Credit Mobilier was fixed at 37,500 shares or parts, while that of the Union Pacific was liable to be increased from time to time; in other words, for convenience.

Oakes Ames, by this agreement, assigns to seven trustees by name, the contract of the 16th of August 1867, upon trust, to perform the same; second, to hold all the avails to reimburse themselves and the Credit Mobilier for all moneys advanced and expended by them or either of them, with interest and commission as thereinafter provided; third, to pay themselves a reasonable sum as compensation, not to exceed $3000 per annum to each trustee.

"Fourth. To hold all the rest and residue of the said proceeds and avails, for the use and benefit of such of the several persons, holding and owning shares in the capital stock of the said Credit Mobilier of America, on the day of the date hereof, in proportion to the number of shares which said stockholders now, severally, hold and own, and for the use and benefit of such of the several assignees and holders of such shares of the stock at the times herein set forth, for the distribution of said residue and remainder of said avails and proceeds, who shall comply with the provisions, conditions and limitations herein contained, which are on their part to be complied with.

"Fifth. To pay over on or before the first Wednesday in June and December in each year, or within thirty days thereafter, his just share and proportion of the residue and remainder of the said proceeds and avails as shall be justly estimated by said trustees to have been made and earned as net profits, in said contract during the preceding six months, to each shareholder only, in the Credit Mobilier of America, who being a stockholder in the Union Pacific Railroad, shall have made and executed his power of attorney or proxy irrevocable, to said several parties of the second part, their survivors and successors, empowering them the said parties of the second part, to vote upon at least six-tenths of all the shares of stock owned by said shareholders of the Credit Mobilier of America in the capital stock of the Union Pacific Railroad Company, on the day of the date hereof, and six-tenths of any stock in the Union Pacific Railroad he may have received as dividend or otherwise, because or by virtue of having been a stockholder in said Credit Mobilier of America, or which may

appertain to any shares in said Union Pacific Railroad Company, which have been so assigned to him at the time or times of the said distribution of the profits, as hereinafter provided, and this trust is made and declared upon the express condition and limitation, that it shall not enure in any manner or degree to the use or benefit of any stockholder of the Credit Mobilier of America, who shall neglect or refuse to execute and deliver unto the parties of the second part, his proxy or power of attorney, in the manner and for the purpose hereinbefore provided, or who shall in any way or by any proceedings knowingly hinder, delay or interfere with the execution or performance of the trust and conditions herein disclosed and set forth, and the above transfer, and conveyance of said contract, is made upon these further conditions, to wit:"

These two paragraphs fully described the cestuis que trusts as clearly and definitely as if the names of the individuals had been written into the contract itself, but who could not avail themselves of its benefits unless they complied with the condition imposed upon them.

Oakes Ames was liable personally upon the original contract, the trustees became personally liable, and so did the individual cestui que trusts upon accepting the terms imposed upon them, making a capital of $30,000,000 for the execution of a contract of $47,000,000.

The first, second and third conditions provide for the concurrent action of at least four of the trustees, to be recorded in a book of the proceedings of the trustees kept by their secretary; that the office shall be kept in New York, and meetings to be held there, and that the trustees shall appoint a secretary, " who shall keep a faithful record of all their acts, proceedings and contracts, in books provided for that purpose, and shall cause to be kept suitable books of account, and vouchers of all their business transactions."

The fourth condition provides for a monthly statement to be made, showing the amount due from the Union Pacific Railroad Company, on account of work done, or equipments or material furnished under the contract, according to the estimate of the engineers of the Union Pacific Railroad Company as provided in said contract, a copy of which statement shall be furnished to the Credit Mobilier of America.

The first part of this condition was eminently wise and proper, and the second became necessary, as the Credit Mobilier who contracted to advance money upon loan, were entitled to know the actual condition of the work done under the contract.

The two remaining trusts provided for vacancies in the board of trustees, and for any default on the part of any of them, a forfeiture of interest in the benefits of the trust.

The trustees accepted the trust, and agreed to perform it, and in all this there is not shown any interest whatever in the corpo-

ration of the Credit Mobilier, or any control by it over the contracts, or any interest, except as specifically stated.

The Credit Mobilier agrees to advance as upon a loan, such sums of money as may enable the trustees to execute the contract —never to exceed the amount provided to be paid by the Union Pacific Railroad Company—interest to be paid on such advances semi-annually, at the rate of seven per cent. per annum, with two and a half per cent. commission on the amount advanced, and they guarantied the due execution of the contract.

By the contract of 16th August 1867, the contractor was bound to assume, and did assume, all contracts and liabilities of the Union Pacific Railroad, for work done and to be done, and materials furnished or to be furnished on account of the road, west of the 100th meridian, and as the Credit Mobilier comes within the stipulation it occasioned the concluding trust and condition in this agreement and assignment in these words:—

" That the trustees shall adjust and pay over to the Credit Mobilier of America, such portion of the net profits of the work done and material furnished on the first 100 miles west of the 100th meridian, as was done and performed prior to January 1st 1867."

It must therefore be said, that, conforming to all the testimony in the cause, the Credit Mobilier had no interest whatever in either of these contracts, or in the profits of the work, except as above stated, and that it was an entire mistake of the accounting department to tax as dividends net profits not belonging in any manner or shape to that corporation.

No money was advanced by the Credit Mobilier Company under the tripartite agreement of 15th October 1867. All that had been advanced by that company was what it had advanced under the Hoxie contract, or in making the 58 miles, and this being provided for and paid, that corporation had no interest in the October agreement. The Credit Mobilier of America being unable to make the advances called for, mutual releases were exchanged, and all connection between the parties of the second and third parts was formally dissolved and closed finally.

The receipts given to the trustees by the cestui que trusts for the dividends declared by them on the 12th of December 1867, January 3d 1868 and June 17th 1868, recognise and adopt all the terms and conditions of the contract of October 15th 1867.

By an agreement made July 3d 1868, between the parties to the tripartite agreement, the said agreement is so modified that " all the trusts in favor of stockholders of the Credit Mobilier of America, and assignees of stockholders thereof, are hereby transferred and vested in the following persons, in the shares and proportions annexed to their respective names, that is to say:—

17 P. F. SMITH—19

[Credit Mobilier *v.* Commonwealth.]

| Name. | Parts. |
|---|---|
| Alley, John B. | 290 |

Here followed a list of names and parts.

This agreement was signed by the stockholders and assigns of the stockholders.

The receipts for dividends for July 3d and July 8th 1868 are signed by the persons so named with their respective parts stated.

There is no evidence showing that the dividends thus made were not really made by the said trustees, and paid to the individuals described in the tripartite agreement, and it is perfectly clear they were not dividends of the Credit Mobilier of America, either directly or indirectly.

Having thus examined and stated the contracts and the parol evidence, we may be allowed to remark, that the error of the judge in his charge and rulings, grew out of his difficulty in getting away from his deliberate ruling on the first trial. He also seemed strongly impressed with the idea that the whole transaction was a fraud, with the intention of cheating the state out of its revenues, when the very questionable manner in which the settlement was made called for strong evidence to sustain it.

The agreements of the 16th of August 1867 and 15th of October 1867 did not by their language sustain the original construction of the court below, and it required external evidence on the part of the Commonwealth to show this was the real meaning and intention of the parties. The intention might be shown by *facts* drawn from the agreement and from external evidence. The facts thus collected were for the consideration of the jury, and it was not the duty of the court to construe a writing which they had once entirely misconstrued.

The court assume that if the stockholders are individually entitled to the profits, although personally responsible, and not shielded from it by the corporation, it will defraud the state of its revenues.

The court say: "There is great ground to fear that hereafter very many corporations created by our laws, will so contrive as to have the profits go into the hands of trustees, to be by them divided among their stockholders, and never come into the corporation treasury, whereby the state will be defeated in its effort to collect taxes on the company's dividends."

This fear, which no doubt affected the jury, is groundless, when the individual stockholders throw away the shield of the corporation, and act as individuals personally liable for all their acts, contracts and engagements. An individual may be described by his Christian name and surname, or he may be so described as to point him out just as definitely and certainly, and such description does not remove or affect his personal liability, and that is the real question here. Are they not individually and personally liable to

[Credit Mobilier *v.* Commonwealth.]

the extent of their private fortunes? If so, the state cannot tax their individual profits as the dividends of the corporation.

The general tenor of the charge was calculated to convey the idea to the jury that there was a huge fraud, which, however modified, withdrawn and explained, had done its work effectually. "But one thing," said the court, "is clear, that soon after the 1st of July 1868, this corporation was unable to advance money, and it was discovered that it had sunk nearly one million of its capital, though managed by the same men all the time. It looks as if this poor Pennsylvania corporation had strayed off to the city of New York, when, like the wayfarer from Jerusalem to Jericho, it fell among thieves who stripped it pretty effectually. But that has nothing to do with this tax." Then why say it! for coming from a judge of very high character in a deliberately written charge, its effect must have been overwhelming.

We have shown what were the real merits of the case, and do not intend to repeat them, but as a whole, the charge of the judge and his answers tended to mislead the jury.

The court erred in rejecting the evidence specified in the 4th, 5th, 6th, 7th, 8th, 9th and 10th assignments of error, proving certain conditions—upon the principle that a condition orally expressed at the time a contract is made (not within the Statute of Frauds), upon the faith of which it was executed, is admissible in evidence: Miller *v.* Henderson, 10 S. & R. 290.

The 8th assignment of error shows that the part rejected by the court made the evidence admitted an untruth; the words admitted are (p. 94 of the Record), "and they did not assent to said contract or the agreement." The part rejected is, "until they had obtained the opinion of counsel that under said agreement the profits on the contract would not enure to the benefit of the corporation defendant."

These are not mere technical errors, but highly important ones, excluding a very large portion of that external evidence, which went directly to prove the intention of the parties in executing these instruments.

We have deliberately and carefully examined this whole case, and have arrived at the conclusion, that the technical primâ facie case of the Commonwealth, weakened as it was by its own showing how the settlement appealed from was made, was, we think, substantially answered by the evidence on the part of the defendants, if believed (and we see no ground for disbelief), and would have justified the court in so presenting it to the jury.

As the case stood on the evidence, it is hardly possible to doubt, that these profits or dividends were not in any manner the dividends or profits of the Credit Mobilier of America, and not liable to taxation as such by the state.

. Judgment reversed, and a *venire facias de novo* awarded.

[Credit Mobilier *v.* Commonwealth.]

We fully concur in the above judgment and opinion, but are also of opinion that under the evidence given by the Commonwealth on the trial below, the court ought to have withdrawn the determination of the case from the jury and given them a binding instruction to find for the defendants.

GEORGE SHARSWOOD,
H. W. WILLIAMS.

November 20th 1871.

After mature reflection I join with my brothers Sharswood and Williams, in their special concurrence above stated.

JOHN M. READ.

AGNEW, J.—I have not had time to rewrite the following opinion since Saturday, and am therefore compelled, in explanation of its language, which purports to be that of the court, to state that it was written to stand by way of report as the opinion of the court. Subsequent discussion, however, has led to the adoption of the opinion of Justice Read as that of the court, and I now stand alone. The ground on which my brethren have reached their final conclusion is, that although the Commonwealth had, upon the settlement of the auditor-general and the evidence at the trial, a case to go to the jury, yet the court below ought to have instructed them to find for the defendant upon the great, indeed only, fact of the cause. That question of fact was, whether the profits arising from the tripartite contract and divided among the stockholders of the Credit Mobilier, belonged to the corporation, the party to that contract, or to·its stockholders in their individual rights, though they were not parties to it. The parties to the tripartite contract were Oakes Ames of the first, the trustees of the second, and the Credit Mobilier of the third part. With great respect for the judgment of my brethren, I cannot but regard this case as a departure from the landmarks of the constitutional right of trial by jury. I am not able to conceive how a fact, which has sufficient evidence to compel its submission to the jury, can be so controlled by the rebutting evidence as to require the judge to instruct the jury that they *must* find for the defendant. A judge may give his opinion upon the fact, but he must at the same time inform them that it is not binding upon them as the constitutional triers of the fact. It is said that nine respectable gentlemen disprove the fact of the ownership of the profits by the corporation. But as I understand the law of the jury trial, it matters not whether nine or ninety-nine witnesses testify to a fact in a certain way, the jury must pass upon their credibility. In this case it was especially proper they should do so, the witnesses being nearly all stockholders and directly interested; and their testimony being absolutely neces-

sary to screen the corporation from a liability of over $600,000, which must fall on the stockholders if not disproved. The only remedy I know for a verdict against the weight of evidence is a new trial, not a writ of error. When a judge on a question of fact, carried to the jury by force of the evidence, can dictate the verdict, the trial by jury becomes a mere name. He may nonsuit the plaintiff, or instruct the jury that the evidence of the plaintiff is insufficient in law, and then he is liable to review in error; but in my judgment it is an unheard-of thing to instruct them as a matter of law that the force of the defendant's evidence must prevail over that of the plaintiff. That the evidence of the Commonwealth was such as required its submission to the jury, was the purpose of the following opinion to show, which I now read.

There are two principal questions in this cause.

First. Whether there was any sufficient evidence to be submitted to the jury of the liability of the Credit Mobilier for the tax imposed on the dividends paid to the stockholders under the tripartite contract.

Second. Whether the court submitted the case with the proper instructions upon the law.

It is conceded that if the profits earned by the trustees under the tripartite contract of October 15th 1867, belonged to the Credit Mobilier, the dividends paid therefrom to its stockholders were its own, though paid by the hands of the trustees. We said when this case was here before, that it was an error to hold that the tripartite contract in and by its terms vested the title to these profits in the corporation, and that the question was one of fact or intention to be found upon the evidence both without and within the written agreement. What evidence then was given of this fact on the part of the Commonwealth, or was furnished by the defence? First, there was the evidence arising from the probabilities of circumstances. The former contract known as the Hoxie contract had been actually executed by the Credit Mobilier, to which a large balance yet remained unpaid. Indeed the very gentlemen now concerned in the tripartite contract had bought up the charter of the Credit Mobilier and subscribed its stock, for the very purpose of executing the Hoxie contract. These same gentlemen, parties to the tripartite contract only as stockholders in the Credit Mobilier, admit that it was their purpose to continue the work west of the 100th meridian under the Oakes Ames contract, and the Credit Mobilier had actually entered upon the execution of the undertaking by preparation for the work on the first hundred miles west of the 100th meridian, a fact recognised and provided for in the tripartite contract. Then there are the probabilities of interest and motive. Precisely the same reasons which induced these gentlemen to use the Credit Mobilier to execute the Hoxie contract would induce them to use it to

execute the Oakes Ames contract. A contract involving an expenditure of over forty millions was no small undertaking for one man or for seven trustees. It would be quite desirable that a corporation handling large sums of money and endowed with extensive credit should stand at their backs and guaranty the performance. What thing was therefore more probable than that the same gentlemen who had bought up the institution and owned its stock and had used it in the same work before, should continue its use by means of the tripartite contract, though in a different form from its former use? There is a probability therefore that the Credit Mobilier continued to be interested in the execution of the work in fact and reality. Now how was this external evidence met and actually supplemented by that found within the folds of the written agreement? What was this tripartite contract, in its true essence, between Oakes Ames, the trustees, and the Credit Mobilier? Ames was the owner of the construction contract for the six hundred and sixty-seven miles of railroad west of the 100th meridian, and yet by the tripartite agreement he divested himself of all title and interest as owner, without a reservation of any of the profits or the receipt of any consideration other than the covenant of the trustees to perform the construction contract, and of the Credit Mobilier to guaranty the performance. The trustees were to receive nothing but a salary. The whole risk and responsibility of the contract and of providing the means for its execution therefore fell upon the Credit Mobilier, and yet it was to receive but a formal compensation by way of a small commission on loans, the interest being but the ordinary compensation for the use of the money. What then was to become of the profits? Profits were expected and were realized to the extent of about a million a month. These profits by the tripartite contract were given to none of its parties, but to persons not parties, to wit, the stockholders of the Credit Mobilier in the proportion of their stock in that institution. Here then is a circumstance of the most pregnant character. The real responsible party, which was to pay all and risk all, received nothing but a paltry commission; while the earnings were to be paid to persons who paid nothing and risked nothing, excepting so far as they were stockholders of the only party that paid all and risked all. The corporation furnished the sinews of work and the shield of security to both the other parties, and why should not its stockholders reap the benefits? To the corporation it mattered not that the profits were paid to its stockholders directly by the trustees and not by its own treasurer. Thus the external and the internal evidence unite in imparting strength to the conclusion that the right of the stockholders to the profits secured to them by the tripartite contract, came to them through the instrumentality of the Credit Mobilier as the meritorious party to that con-

tract.  But that is not all the proof.  This evidence is again strengthened and reinforced by the fact of a rescission and the terms of the agreement of rescission of the 3d of July 1868, excluding the Credit Mobilier from further participation in the tripartite contract.  It declares that " all the trusts in the tripartite contract *in favor of the stockholders*" " *and assignees of stockholders*" shall be vested in the " persons" therein named, and provides that " all dividends and payments by said agreement (tripartite) directed or provided to be made to the *stockholders* shall be made to so many of, and such of, the persons above named, and with the proportions above specified, as shall comply with the provisions, conditions and limitations in said agreements contained to be complied with on part of such *stockholders* and *assignees.*"  The very purpose of the agreement of July 3d 1868, was to put an end to the interest of the recipients of the profits as *stockholders*, and this is expressed in words.  Now while we may suppose that the use •of the term " stockholders" in the agreement of rescission was the inappropriate language of the scrivener, used as the synonym of the phrase in the tripartite contract, to wit, " *persons* holding and owning shares," yet we cannot deny to the Commonwealth the use of the agreement of rescission before the jury, and the right to attribute to it the ordinary meaning of its language in corroboration of the evidence already referred to.  How then can it be said, in view of all these facts and inferences, that there was no evidence of the ownership of the profits of the tripartite contract by the Credit Mobilier on part of the Commonwealth?  On the contrary, the evidence was primâ facie sufficient and had to be submitted to the jury.  It is only when confronted by the evidence of the defence that its weakness appears.  Therefore, when it is said in reply to all this evidence of interest in the profits on part of the corporation, that it is fully explained and disproved by the evidence for the defence, we can only answer, *that* was a matter for the jury ; the question is not *how* the verdict ought to have been rendered, but whether there was sufficient evidence of the title of the Credit Mobilier to the profits to carry the case to the jury.  The credibility of the witnesses is always a matter for the jury, and the chief witnesses here were interested as stockholders in avoiding payment of the tax.  Hence, however respectable and credible these gentlemen were, their credibility belonged to the jury and not to the court.  The court therefore committed no error in submitting the case to the jury.  Nor did the judge err in saying that it was too late, after all the evidence on both sides was in, to raise the point that there was no evidence on which the account was settled to send it to the jury ; that the objection should have been made when the paper was offered.  The case was then actually in possession of the jury, upon sufficient primâ facie evidence of the claim of

the Commonwealth.   On this point it is proper also to add that the corporation was in default.   It had made no return or report under the second section of the Act of May 1st 1868, and the presumptions of fact were against it.   Non-report is an offence followed by a penalty, itself the subject of the settlement of an account, and if persisted in for three years, to be visited with a forfeiture of charter.   Besides, the thirteenth section gives authority to the auditor-general and state treasurer, or to any agent appointed by them, to examine the books and papers of the corporation, to verify the accuracy of any return made to them.   This duty was performed by Mr. Foster, of the auditor-general's office, and his testimony was before the jury in addition to the account settled in the office on his own examination of the books and papers of the trustees in connection with the contracts already noticed of the Credit Mobilier.   The effect of his testimony was to be determined by the jury.   Upon the whole the judge was right in submitting the case to the jury, and this disposes of many of the numerous assignments of error.

The second branch of our inquiry, is whether the court gave the proper instructions on the law of the case.   The vital point of the issue was, whether the right of the stockholders to receive the profits of the tripartite contract came to them through the Credit Mobilier or in their own right through their individual relation to the construction contract of Oakes Ames.   The instructions on this point were clear and explicit and without error. Thus the judge said : " Mr. Ames being the owner of the contract with the Union Pacific Company could unquestionably dispose of it as he saw proper, and to whom he pleased, provided he complied with its terms.   The Supreme Court has decided that the transfer of this contract made by the contract of the 15th of October 1867, was not to the Credit Mobilier of America, but to the trustees named as the second party for the use of the persons who were the stockholders in that company, and if the corporation had any interest in the contract it was not by the terms of the tripartite agreement but from facts not recited.   It is evident, says the court, that any title the Credit Mobilier might have could be shown only by proving that Oakes Ames held the construction contract as its trustee, or that his assignment was intended under the guise of a trust for the stockholders to vest the title in the company.   This intention might be shown by facts drawn from the agreement and from external evidence."   After discussing the facts the judge sums up his general instruction thus: " We instruct you that if the Credit Mobilier received the whole of this money arising from the profits of constructing the Union Pacific Railroad *as a corporation*, and divided it among its stockholders as such, it is taxable.   If it was received by the trustees to be divided among the stockholders as *individuals*, it is not taxable,

and on that point this case turns. Using the names of the trustees in making the dividends is unimportant, provided the money belonged to the corporation."

This was followed by the answer to the plaintiff's 5th point, asking the court to say that if the jury found from the evidence that the dividends were paid to persons who were stockholders in the corporation in the proportion of the stock held by them in it, it is immaterial whether the dividends were to be received by them as stockholders or as individuals. The answer of the court was: "As we understand the decision of the Supreme Court this case does *not* turn on that question, but on how the money divided was owned. If it never belonged to the corporation, but was divided by the trustees among the men as *individuals* who were stockholders, although in proportion to the amount of their stock, it is not subject to taxation by the Commonwealth." Thus the law of the case was given to the jury in a clear, intelligible and satisfactory manner. In addition to this, the defendants had the benefit of their 1st, 2d, 3d, 4th, 6th, 9th and 12th points, which were all answered substantially in the affirmative. We cannot see, therefore, any good ground of complaint against the instructions given to the jury. Pennsylvania Railroad Co. *v.* Berry, decided at our last term in Philadelphia, has no resemblance to this case. There the true question in the cause was not correctly presented to the jury, a part of the case was kept out of view, and the whole tenor of the charge tended to lead away the minds of the jurors from the turning-point of the cause. No such error was committed here.

It is proper now to notice some matters of special complaint. In affirming the defendant's 1st point the court added this qualification: "That when profits are divided among the stockholders in proportion to the amount of their stock, it is a legal presumption that they come from the corporation, yet that may be explained or repelled." It is argued that this was as much as to say that a legal presumption arises from the tripartite contract that the profits belonged to the Credit Mobilier, and therefore contradicts what this court decided and what the judge himself said in his charge to the jury. We do not think so. The qualification must be read in the light of the point, which made no reference to the tripartite contract, but asked instruction upon a general proposition. The point was this: "The burden of proof lies on the Commonwealth to show that the dividends were made by the corporation defendant." The judge answered: "The law is as stated; yet when profits are divided among the stockholders in proportion to the amount of their stock, it is a legal presumption that they come from the corporation; yet that may be explained or repelled." The qualification, like the point, was merely the statement of a general proposition correct in itself.

No reference was made to the tripartite contract, and it is not reasonable to suppose that he meant to contradict flatly the instructions he had so clearly and precisely given upon that contract. Precisely of the same character is the remark of the court, also complained of, contained in the answer to the plaintiff's last point, in which it was said : "The state had a right to infer that when dividends were made among the stockholders of one of its corporations in proportion to the amount of their stock, it was the profits belonging to the corporation, and to tax it accordingly." This was not applied to the interpretation of the tripartite contract, nor could the jury infer it was so intended, after being instructed so clearly upon that contract as they repeatedly had been. The error in the argument is in assuming that there was no evidence of title in the corporation to go to the jury except the tripartite agreement, which we have seen is not correct.

The complaint of the tax on the dividend in Union Pacific Railroad Company's bonds, for which certificates were ordered July 3d 1868, amounting to $2,390,625, has more substance in it. The evidence shows distinctly that these certificates were prematurely ordered to be issued, on a merely estimated profit which was never earned or received, and was not paid except through a compromise with the holders of the certificates, which required them to subscribe and pay for an equivalent sum in stock of the railroad company in order to raise the money. No bonds were issued except to those who made the subscription. Those who subscribed and paid for the stock got the bonds at the rate of eighty per cent. of their certificates. In this transaction no profit was earned or belonged to the Credit Mobilier and none accrued to its stockholders through its business. The bonds received were the result of an individual arrangement which was made to save the trustees from loss in issuing the certificates without a basis. The testimony on this point is uncontradicted, and the jury ought to have been told that the corporation was not liable for the tax. It is not necessary to reverse the judgment to correct this error. The judgment will be modified upon the Commonwealth's releasing so much of the verdict as represents this part of the tax.

These are the only errors assigned to the charge and answers we think it necessary to notice. The others are not supported. A careful examination discloses no material error in any of the bills of exception to the rejection of evidence. It will not be useful to enter upon a minute discussion of their merits, but it may be remarked in brief, that the mere fact of the injunction against the contract with the Credit Mobilier was immaterial to the question before the court, and if material the fact was in evidence through the testimony of C. S. Bushnell. It was the ground of the injunction which was the material matter in cor-

[Credit Mobilier *v.* Commonwealth.]

roboration of the defendant's witnesses, and this could be shown only by the record of the bill setting forth the parties and the causes of the injunction prayed for. The impropriety of parol proof of these matters is seen in the testimony of Sidney Dillon, who could not be sure whether the injunction was to restrain the Union Pacific Company from contracting with the Credit Mobilier, or the Credit Mobilier from contracting with the Union Pacific. There might be very different reasons in either case which might not touch the question before the court.

So the attempt to prove by parol and the mere understanding of witnesses of written resolutions, that the Oakes Ames contract was subject to the approval of the stockholders of the Union Pacific Company, was properly refused. The resolution of October 1st 1867, was one adopted by the executive committee long subsequent to the execution of that contract, and not by the directors or stockholders. The statement of the witness was an evident attempt at interpretation on his part. The resolution itself was rejected only because of its total irrelevancy to the testimony of the witness, and it was not offered independently. The resolution of the 12th of December 1867, was actually read in evidence. But all this rejected evidence was merely cumulative or corroborative. The facts themselves as to the Oakes Ames contract; the relation of the Credit Mobilier and its stockholders to this contract and to the tripartite agreement; and the facts as to the controversy in regard to the Credit Mobilier becoming a party to execute the construction contract, and indeed everything material to the question in issue upon the ownership of the profits, were fully in evidence by the direct and positive testimony of half a dozen or more witnesses on the part of the defence. The rejected evidence was merely supplemental and corroborative. It is clear, therefore, that no injury was really suffered by the rejection of these offers. A court must be intrusted with some discretion in relation to evidence merely cumulative or corroborative. An abuse of this discretion or a palpable error will be corrected, but we discover nothing of that kind here. It was said in Cumming *v.* Garside, 6 Whart. 302, "that we never reverse for an error clearly unattended with actual prejudice, as was determined in Campbell *v.* Colhoun, 1 Penna. 140, and Johnston *v.* Brackbill, Id. 370." See also Ormsby *v.* Ihmsen, 10 Casey 472; Wolverton *v.* The Commonwealth, 7 S. & R. 273; Girard Fire Insurance Co. *v.* Marr, 10 Wright 504.

Upon the whole case there is no error sufficient to reverse the judgment, except that as to the tax on the certificates of July 3d 1868, which will be removed by the release we have indicated.